## Court of Appeals.

October 8, 1895.

## PEOPLE v. BARTHOLOMEW, SHEA.

(69 St. Rep. 320; 147 N. Y. 78.)

**1. APPEAL—CRIMINAL ACTION.**

Upon a review under subd. 8 of section 485, and sections 517 and 528 of the Code of Criminal Procedure, the court of appeals not only acts in the capacity of an ordinary appellate tribunal reviewing errors of law pointed out by exceptions duly taken, but it is the duty of the court, if satisfied that the verdict is against the weight of evidence or against law or that justice requires a new trial, to grant it whether any exception shall have been taken or not, in the court below.

**2. COURT—EXTRAORDINARY TERM OF OYER AND TERMINER.**

The governor is not precluded from designating the same time and place for holding an extraordinary term of the court of oyer and terminer as were previously designated by the justices of the supreme court for holding a regular term of the court.

**3. CRIMINAL ACTION—INDICTMENT—MOTION TO DISMISS.**

A motion made to the trial court to dismiss an indictment for murder, on the ground, among others, that certain persons, not officers of the law, had issued and distributed to each person on the grand jury list a circular letter advising them as to their duties and on other questions alleged to be prejudicial to the defendant, is properly denied, where it appears that there was no proof that any man was on the panel who was not a legally constituted juror or even an allegation that the evidence given before the jury was in-

VOL. X—1

competent in its nature or insufficient, if believed, to warrant the indictment.

4. SAME—MOTION TO POSTPONE.

A motion to postpone the trial, based upon the affidavit of the defendant's attorney, which does not assert that there is any absent witness but only suggests that the counsel want time and that it is not customary to try an indictment for so grave an offense so soon after it is found, is properly denied.

5. APPEALS—COURT OF APPEALS—CRIMINAL ACTION.

Upon a review under subd. 8 of section 485, and sections 517 and 528 of the Code of Criminal Procedure, the court of appeals will not reverse the finding of the jury where such finding is not clearly against the weight of evidence and does not appear to have been influenced by any improper considerations, in case there is at least a conflict in the evidence from which different inferences might be drawn.

6. EVIDENCE—MURDER—ANOTHER OFFENSE.

Evidence, which is relevant to the issue by tending directly to explain or characterize the act which is in question on a criminal trial, is not incompetent or inadmissible because it also tends to, or does, prove the accused guilty of another crime.

7. CRIMINAL ACTION—INDICTMENT—OMISSION OF NAME OF WITNESSES.

The defendant is not entitled, on a motion after conviction, to a new trial on the ground that the names of some of the witnesses who were examined before the grand jury were not indorsed upon the indictment as required by section 271 of the Code of Criminal Procedure, which omission was not ascertained by him till in the progress of the trial; especially not, where he has suffered no prejudice by the omission, or it does not appear that the omitted witnesses were of such a character that he was prejudiced by the reception of their evidence by reason of the fact that he had no time or means to show their true character, or that their particular testimony was false.

Appeal from judgment of the court of oyer and terminer of the county of Renesselaer, entered upon a verdict convicting defendant of the crime of murder in the first degree in killing one Robert Ross.

John T. Norton and Galen R. Hitt, for appellant.

Thomas S. Fagan, and George Raines, for respondents.

PECKHAM, J.—The defendant, having been convicted of the crime of murder in the first degree at an extraordinary term of a court of oyer and terminer held in the city of Troy, has by appeal brought the record of his trial before this court for review pursuant to subdivision 8 of section 485, and sections 517 and 528 of the Code of Criminal Procedure.

There has been imposed by the sections of the Criminal Code above mentioned a very arduous duty upon this court. We act not only in the capacity of an ordinary appellate tribunal reviewing errors of law pointed out by exceptions duly taken, but if satisfied that the verdict is against the weight of evidence or against law or that justice requires a new trial, it is the duty of the court to grant it whether any exception shall have been taken or not in the court below. The duty imposed upon us is that of reading the whole evidence in the case of every conviction of murder in the first degree. The Code provides, subdivision 8 of section 485, that the case and exceptions shall consist, among other things of a copy of the stenographer's minutes of the trial, the result of which provision is that a large mass of evidence, frequently upon points not really disputed or disputable, is returned, all of which must yet be persued before this court can properly come to a conclusion in the case. It seems to us that a practice might be provided by the legislature which, while retaining all that is now sought for in an appeal to this court, would yet restrain within some reasonable limits the printing of a vast mass of prolonged examinations and cross-examinations filled with repetitions and immaterial matter and set forth by question and answer. The case now before us is an apt illustration of the vice of this kind of practice. Ten thousand folios, embracing some two thousand printed pages of evidence, compose the record, exclusive of some three hundred pages of examination of jurors, no question in regard to whom was raised or argued in this court. Taking all this mass of evidence and printing it by question and answer with its innumerable and everlasting repetitions of the same thing said in the same way, does no good to any one and at the same time makes the reading a burden which ought not to be imposed upon the court. The evidence should, as it seems to us, be placed in

the record and the case settled by the trial judge as in other cases and not more than the material evidence should be in a narrative form.

Notwithstanding this great mass of evidence returned as the present law provides, the whole record has been examined and deliberated upon with that degree of care and attention which the interests at stake would naturally call for.

The counsel for the defendant have argued before us several propositions which will be now disposed of.

First. Objection was made in due time to the jurisdiction of the court to try the defendant on the ground that it was an extraordinary court of oyer and terminer, called under the proclamation of the governor and designated to be held on the same day for which a regular and ordinary court of oyer and terminer had theretofore been properly appointed by the justices of the supreme court, and it was asserted that there was no authority of law for organizing or holding more than one oyer and terminer in the same county at the same time. Some criticism was also made in regard to the form of the proclamation convening the extra term, in that it appointed "an extraordinary court of oyer and terminer" instead of an extraordinary term of the court of oyer and terminer as provided for by section 234 of the Code of Civil Procedure. This latter criticism is so clearly without merit that we do not feel called upon to further discuss it. The other objection is also untenable. The law provides for the designation by the justices of the supreme court of the times and places for holding the ordinary and usual special terms, circuit courts and courts of oyer and terminer in the several judicial departments of the state. Code of Civil Proc. § 232. It is then provided by section 234 that the governor may, when in his opinion the public interest so requires, appoint one or more extraordinary general or special terms of the supreme court, or terms of a circut court or court of oyer and terminer. He is granted power by the same section "to designate the time and place of holding the same." There is no limitation in the grant of power to the governor of which he cannot designate a time and place for the holding of the court, which is the same time and place already designated

by the justices of the supreme court for the holding of a regular term of the court. The statute is full and ample, and under it the discretion is vested wholly with the governor as to the occasion for appointing and the proper time and place for holding the extra term of the court which he convenes.

Second. The defendant also moved to dismiss the indictment presented to the court on the ground, first, that improper and unlawful influences was exercised upon the board of supervisors in the selection of the grand jury; second, that certain persons, not officers of the law, issued and distributed to each of the persons composing the grand jury list of 300 names a circular letter advising them as to their duties and on other matters preju· dicial to defendant's rights; third, that unauthorized persons had interviews with the grand jurors composing the panel which brought in the indictment, and by such means unlawfully procured the bringing in of the indictment.

The motion was based upon affidavits of the defendant and his attorney, and the only fact proved was the distribution of a circular to grand jurors reminding them of the great importance of their duties; stating some of their powers as evidence by citations from the statute; offering to further advise them if they would call at the headquarters of the committee of the methods by which each grand jury could do effect work. It was added that the efforts of the committee were not for political or sectarian effect, as it was composed of Roman Catholic priests, several Protestant clergymen and a number of prominent Republicans and Democrats. The circular was signed by the chairman and secretary of the committee, which at the head of the circular was designated the "Committee of Public Safety."

The defendant in his affidavit characterized this circular in quite a variety of language, and he therein stated as a fact that it had rendered the members of the grand jury who found the indictment unfit and improper persons to perform judicial functions or to administer justice according to law, or to see that the rights and securities guaranteed by the constitution and the laws of a free country were secured to the defendant. The defendant had been confined in jail ever since the death of Ross,

and the question would, of course, suggest itself as to where the defendant obtained his knowledge of the effect of the circular upon the grand jurors who listened to the evidence in the case, and, upon their oaths, alleged that he was guilty of murder in the first degree. His affidavit furnishes no light upon that subject, nor is there any given by the affidavit of his attorney.

It is unnecessary to here discuss the question whether there was not some matter in the circular which as addressed to possible and prospective grand jurors it would have been better to have omitted. It is the duty of the court to charge the grand jury and to explain the duties of the grand jury in such manner and to such extent as in its discretion is deemed best. What ever the contents of the circular may have been, some prejudice to the defendant must result, or such facts be proved that an interference of prejudice could justly be drawn therefrom before the court would be called upon to interfere in the way suggested by this motion, even if it had the power to dismiss on such ground. We here assume that the law gives to this court jurisdiction to review the determination of the court below on this point, which we are not at all sure of, but which it is not necessary here to decide because we are of the opinion that the court below decided the questions correctly. There was not a particle of proof that any man was on the panel who was not a legally constituted juror, fulfilling in every respect all the requirements of the law. There was not even an allegation that the evidence given before the jury was incompetent in its nature or insufficient if believed to warrant and call for the indictment which was found. There was absolutely no ground set forth which was sufficient in law to justify the court in dismissing the indictment, and the defendant has no ground of complaint based upon the denial of this motion.

Third. The defendant then made a motion to postpone the trial based upon an affidavit of his attorney. The motion was denied, and, as we think, properly, although here also it is doubtful if we have any jurisdiction to review the decision of the court on this question. The counsel for the defendant did not assert that there was any absent witness, and, as the learned trial judge said, the motion seemed to be based upon the sug-

gestion that the counsel wanted time, and that it was not cus-
tomary to try an indictment for so grave an offense so soon after
it was found.

The decision of the court was so plainly right as to require
no discussion.

Fourth. The counsel for the defendant appeals to us for a new
trial upon the general merits of the case and on the ground that
justice requires it. A plain statement of some of the more im-
portant facts appearing in the record will not be out of place in
disposing of this ground for a new trial. Some of them are
sworn to by the defendant himself upon cross-examination, and
others are attested by a large number of witnesses who we have
no doubt tell the case as it appeared to them and as in fact it
was. There was a charter election in the city of Troy on the
6th day of March, 1894, at which a mayor and supervisors and
aldermen were elected. Although the contest was quite ani-
mated in the thirteenth ward over the election of mayor, yet
the greater interest and excitement were there raised in the
election of alderman. Two Republican candidates were run-
ning for that office, each of whom claimed regularity of nomina-
tion, while the Democrats had made no nomination of their own,
and the whole contest for aldermen was carried on between the
two Republican nominees. Mr. Dunlop was one of such nomi-
nees and Mr. Hancox was the other. The defendant was a
friend of Mr. Dunlop and sometimes tended bar for him when
Dunlop desired to be absent from his saloon. There had been
a Republican ward caucus in February preceding the election,
at which there had been a contest for the nomination for alder-
man between Dunlop and another, and the defendant had been
present at that caucus, and his friend McGough was chairman
of it. The latter was also a friend of Dunlop. At the caucus
there was a disturbance between the friends of the different
candidates, the Ross brothers and Boland and some others be-
ing on one side, and McGough, the defendant Shea and others
on the opposite side. Shea broke through a window to come
into the place where the voting was going on and brandished
a revolver which he had, and went to his friend McGough, who
gave to him the ballot box, and the defendant then marched

out of the room with it and gave it back to McGough some
distance from the polling place. The trouble then arose as to
the regularity of the proceedings of the caucus, and the two men,
Dunlop and Hancox, ran, each claiming to be the regular
Republican candidate for alderman of the ward. It is evident
from the record that there was great and continuous excite-
ment upon this question of the election of alderman among
those who took an interest in the politics of the ward from the
time of the caucus up to the day of election. The evening
prior to that day, the defendant provided himself with his pistol
for the reason, as he said, that he always anticipated more or less
of a row on election day. He is a young man and was then but
about twenty-three years of age and a moulder by trade, but by
no means a steady worker, traveling to the west and working
"off and on." He and his friend McGough and one or two others
with them were very greatly interested in the success of Dun-
lop, and so far did they carry their interest that during election
day they carried on, as leaders and conductors of a number
of ruffians, the most open, shameless and reckless system of
fraudulent voting, by means of repeating and by false persona-
tion of legal voters, that has ever come to our notice. Fraud
as a means or measure of concealment was not resorted to. The
names and residences of reputable and well-known citizens
were openly taken, called out to the inspectors of election and
voted on by these miscreants while the citizens themselves,
whose names were thus taken, were in the booths preparing
their ballots, and in some instances the citizen would come
out of the booth and protest against his name being used for
such a purpose, but no weight was given to the protest, and,
when challenged, these repeaters swore in their votes under
the names thus taken. A line of legal voters, formed for the
purpose of voting in their proper turn, would be broken and the
"bunch" of rascals would get to the polls and deposit a ballot
and retire only to repeat the performance at the same poll in
a short time. This was particularly the case at the first election
district of the ward, and the defendant and others acted as the
captains and directors of the men who were personally doing the
repeating, conducting them to the polls from a saloon near by
and gathering them again in time for another raid. This con-

duct of the defendant and his companions is almost beyond belief, and were it not for the fact that it has been testified to by numerous witnesses, who, so far as we can judge from the record, were reputable business men and entitled to credit, we should have great hesitation in accepting the narrative as true. The reckless audacity displayed in the commission of these offenses would ,of itself, lead us to doubt whether any one would be willing to run such risks as to thus openly violate the law in the presence of so many reputable and decent men. The facts are, however, established by evidence which is simply overwhelming. In the light of such events it is a somewhat difficult task to preserve that judical temper which ought always to characterize the expressions of the views of this court. Such acts as those above described are not alone a gross outrage upon the rights of the citizen, but they lead directly to riot, bloodshed and murder; and if they should become habitual, there would cease to be a government by the people, might would become right, and anarchy and despotism would be the result. In this case it was by reason and while in the actual perpetration of these lawless acts, that the deceased Robert Ross was killed. He was one of four brothers, living in the third district of the thirteenth ward, and all of whom were engaged in the business of manufacturing in the city of Troy. They were all interested in the election, and were bitterly opposed to Mr. Dunlop and his friends. They expected some trouble at the polls, and they had armed themselves with clubs, and some of the party had pistols also. This conduct on the part of the deceased and his friends in thus arming themselves in a peaceful community, is characterized by counsel for the defendant as evidence of lawlessness on the part of the former, and as being the direct cause of the trouble which arose subsequently. Perhaps it was evidence of lawlessness. It is stated that if, instead of arming and preparing themselves for an affray, the deceased and his friends had borne themselves as law-abiding citizens, no trouble would have arisen, and that it was owing to their own violations of law that the deceased came to his death. Looking at the trans-

action in the light of the facts testified to, it would seem that, in order to completely act the role of peaceful and law-abiding citizens, it would have been necessary either to remain absent from the polls entirely, or to quietly and without even remonstrance submit to the open violation of the law by the defend-. ant and his companions; to look on with the silence of resigna-·tion if not of approbation while they stuffed the ballot box and weighed down the votes of honest and reputable citizens by the votes of these repeaters. Under these circumstances we cannot say that those men who had armed themselves for the purpose of resisting an attack and for self-defense, were themselves thereby guilty of a violation of law because they refused to be driven from the polls and attempted to answer with force an armed attack upon themselves. The arming of citizens for the purpose of forwarding the interests of particular candidates at an election and to intimidate others from the exercise of their legal rights cannot be too severely or too summarily condemned and legally punished. This court cannot listen with complaceney to an account of the arming of the citizens of any portion of the state for the purpose of going through the forms of holding an election and to be ready to protect themselves in case of attack. It is an appeal to the force of arms instead of to the protection of the law, and such an appeal is one which courts cannot be expected to look upon with the least patience or toleration. Still, when the whole case is surveyed, the criticism comes in bad form from the defendant, and we think that there is nothing in the evidence which justifies him or mitigates the character of his act.

Up to the time when the defendant and his companions appeared, it is not pretended that the least disorder had prevailed at the polling place, although it may be assumed there were men belonging to al parties there present. The trouble commenced upon the arrival of the defendant and friends, and the fighting were precipitated by them. While condemning in unmeasured terms the general practice of carrying weapons, we cannot, in this case, admit that the deceased or his companions ought to be denounced as violators of the public peace because of their conduct on this occasion. Courts cannot and

must not recognize the claim of right to take the law into their own hands by citizens under any circumstances, but at the same time they can see the difference and make the proper distinction between acts done in furtherance of an unlawful purpose and in violation of the criminal law, and those acts which are done by private citizens in order to obstruct the accomplishment of that purpose and to prevent such violation. The citizen must not himself be guilty of a violation by others, but the intent with which an act is performed is the important fact which characterizes and gives point and force to the act itself. We think the action of the deceased and his friends cannot properly be said to have led to this catastrophy. Early on election day the deceased and his brothers went to the polling place of the third district. There is no proof of any dispute or difficulty arising there in the absence of the defendant and his companions, and it is entirely evident that the trouble that was anticipated was to come only from that quarter. The defendant and his friend McGough and some others were present at the third district polling place on one or two occasions during the forenoon and before the time when the affray in question occurred. On one of these occasions they commenced a quarrel with some one of the Ross party and struck one or two in the face, but nothing serious then took place, and the defendant and his party left the polls. Finally, a little after twelve o'clock, the defendant, McGough and others, to the number of seven or eight,, were seen on their way to the third district polling place, and some of their number, in the presence of the defendant, were heard to utter threats to "do them," that they were strong enough and they should "come on;" "to hell with them," and such expressions. Upon their arrival at the polling place, which was held in a small house a little back from the street, they started at once for the room in which the ballot boxes were, the defendant only going as far as the hall leading into the room, and some of his men passing in and at once proceeding with their scheme of voting. It was at this time, and while the defendant was in the hallway, that one of his men assumed the name of William Armstrong, of 51 Glen avenue, and claimed his right to vote on such. The real William Arm-

strong was then in the booth preparing his ballot and hearing the claim stepped out and faced the man and asked him if his name was William Armstrong and if he lived at 51 Glen avenue, to which the man answered "Yes," and Armstrong replied, "You don't do it; I am the only man that lives there; I occupy the whole house; you don't live there at all;" and turning to the inspectors, he said: "This man has no right to vote here; he is a repeater." The man voted, nevertheless, on that name, and the real Mr. Armstrong had to swear in his vote. One or two more efforts to repeat were made by others of the defendant's men while he and his companions were in the hallway blocking up the same to a great extent, and exercising a supervision over the whole of their subordinates. Before the completion of that work one of the opposition, named Hayner, came to the hallway and persisted in an attempt to get through it and into the voting room, claiming as much of a right to be there as any of the others. His passage was blocked and obstructed by defendant and his companions, and the result was the expulsion of Hayner, who was immediately followed by defendant and others, all going out into the open air. Here a slight affray took place, the defendant and McGough striking some of the others, among them Hayner, and the latter replying by attempting to strike back, and pulling a sort of wrench, used by stovemounters, from his pocket, he atttempted to use, and did use, it upon some of his opponents. The defendant and McGough had pistols in their hands. The crowd became quite thick, surging back and forth and up and down the open street, and during that time McGough and William Ross came together, and the latter was shot by the former and fell at once. Robert Ross, seeing the difficuty, started towards where his brother fell and ran in pursuit of McGough, who was running away, and whom he soon overtook, and just at that time, owing to some stumble or misstep on the part of one or both, McGough and Robert Ross fell, the former under and the latter half covering him. At that time the defendant came toward Robert, and while Robert was in a sitting or bending attitude the defendant walked up behind him, and placing his pistol within two or three feet of the back of Robert's head deliberately fired it into him; the defendant was then, as some of the witnesses testified,

seen to walk around in front of Robert and again to fire his pistol at him, McGough, in the meantime, had twisted himself from under Ross, and getting up, proceeded to run away, in which action the defendant then joined. This description of the affray which resulted in the death of Robert Ross is very meagre as compared to that given with great detail by the numerous witnesses called by the prosecution, but enough is given to show the main points. Some fifteen or twenty shots in all were fired by different men. The first ball which was fired by the defendant at Robert Ross penetrated the back part of his head, entered the brain and caused instant death. The autopsy showed this fact.

As may be supposed, the account of this affair given by the defendant and his witnesses differs radically from that which has been stated above. The facts claimed by the prosecution were proved by more than twenty different witnesses, and while no two saw the whole transaction in exactly the same light as to every detail, yet they all agreed as to the main facts in regard to the shooting of the deceased, and as to how and in what position relative to the deceased the man stood when the shot was fired. All the witnesses did not recognize the defendant as the man who did the shooting, being too far off to identify him, but about fifteen respectable men saw the occurrence and identified the defendant as the man who did the shooting, and under the circumstances detailed above. The defendant denied in toto the shooting; he denied that he was at the spot at the time the shooting was done, and insisted that at the time he had himself been shot, and was leaning up against a fence too weak to stand alone. In the course of the affray it is true that the defendant was shot and slightly wounded, but no serious effect was produced by it, and he was seen to run from the place as soon as he had done the shooting. The defendant is contradicted in his story not only in its main points by many witnesses, but he was himself guilty of several misstatements as to the occurrence when asked about it soon thereafter. He denied having had any pistol, and he denied having done any shooting on the day in question, and it is plain that each denial was false, and in the course of his cross-examination he so conceded. The

witnesses which were called for him were the men who were his companions during the day, and were present at the time of the affray. They appeared in a very unsatisfactory light on cross-examination as to their character and antecedents. One or two of them had served terms in the penitentiary and not one of them seems to have been a steady worker at anything, other than frequenting saloons and passing his time in such pursuits as are usually followed there. While denying the shooting himself, the defendant and his witnesses endeavored to give the impression that the deceased was in reality killed by one Boland. It appears without contradiction or dispute that Boland was one of the Ross party, supporting the same candidates, a member of the same wing of the Republican party and a close friend of the deceased and of his brothers and that he was engaged in a respectable business in Troy. How there could be any possibility of Boland shooting Ross was something calling for an explanation as on its face the proposition was absurd. The explanation was attempted on the part of the defendant by showing one man fifteen or twenty feet ahead of Robert Ross and, just before the shooting, running away from Ross, while a few feet in the rear of Ross, who was himself running in pursuit of the fleeing man, was Boland who had a pistol in his hand and while running fired it and Ross immediately fell. This it was urged left room for the explanation that both Ross and Boland were in pursuit of the same man and all three in a line running towards the west, the unknown man ahead, Ross behind and within fifteen or twenty feet of him, and Boland very near Ross but behind him and that, while thus in pursuit, Boland, in attempting to shoot the foremost man, did through mistake shoot Ross. A great many well-attested facts are at variance with this theory. The course of the wound in the back of the head of Robert also demonstrates the falsity of the claim. One of the witnesses for the defendant took the position that there was no mistake about it; that he saw Boland aim his pistol directly at the head of Ross and but a short distance from it, and then deliberately fire at and kill his companion and friend.

Such manifest and reckless perjury it is sickening to read. To sum up, here were presented the two different contentions on the part of the prosecution and the defendant. There was no claim or assertion made on the part of the defendant that the killing was done in self-defense or in the heat of passion or to aid a companion of the defendant. His version of the occurrence precluded any defense of that nature, for he denied that he shot the deceased at all and asserted that the whole evidence of the People as to the affray, so far as he was concerned, was a deliberate falsehood or at any rate a mistake. The issue thus formed was presented to the jury in a fair charge by the learned trial judge, to which no exception was taken and the jury have found the defendant guilty as indicted. We are now asked to set that verdict aside upon the merits and to grant a new trial because justice requires it. We cannot do it. We are entirely satisfied that the jury have arrived at a just conclusion, although if we had a rational doubt on that subject, there being at the least a conflict in the evidence from which different inferences might be drawn, we should not feel at liberty to reverse the finding of the jury where such finding is not clearly against the weight of evidence and does not appear to have been influenced by any improper considerations. People v. Taylor, 138 N. Y. 398; 52 St. Rep. 914.

Fifth. The counsel for the defendant challenge the correctness of the rulings of the trial court in admitting evidence of the repeating in the presence and under the supervision and direction of defendant at the different polls as stated in the point last discussed. Proper exceptions were taken to the decisions of the court in that regard and the question has been argued before us at great length. The objection taken is that the evidence was immaterial and had no proper or legitimate bearing upon the issues joined for trial, and that it simply tended to show the defendant guilty of some other, separate and different crime from that for which he was indicted and then on trial and to greatly prejudice him in his defense. The impropriety of giving evidence showing that the accused had been guilty of other crimes merely for the purpose of thereby inferring his guilt of the crime for which he is on trial may be said

to have been assumed and consistently maintained by the English courts ever since the common law has itself been in existence. Two antagonistic methods for the judicial investigation of crime and the conduct of criminal trials have existed for many years. One of these methods favors this kind of evidence in order that the tribunal which is engaged in the trial of the accused may have the benefit of the light to be derived from a record of his whole past life, his tendencies, his nature, his associates, his practices, and in fine, all the facts which go to make up the life of a human being. This is the method which is pursued in France, and it is claimed that entire justice is more apt to be done where such course is pursued than where it is omitted. The common law of England, however, has adopted and, so far as the party accused is concerned, a much more merciful doctrine. By that law the criminal is to be presumed innocent until his guilt is made to appear, beyond a reasonable doubt, to a jury of twelve men. In order to prove his guilt it is not permitted to show his former character or to prove his guilt of other crimes, merely for the purpose of raising a presumption that he who would commit them would be more apt to commit the crime in question. In People v. Sharp, 107 N. Y. 427; 12 St. Rep. 217, the doctrine is dwelt upon and the cases upon the subject collected.

Evidence, however, which is relevant to the issue by tending, for example, directly to explain or characterize the act which is in question on a criminal trial has never been held incompetent or inadmissible because it also tended to, or did, prove the accused guilty of another crime. We think the evidence in question comes under this latter rule. It was received by the learned trial judge upon the question of the intention and deliberation of the defendant in firing the shot at the deceased. The evidence admitted, together with other evidence, shows the defendant highly interested in the election of his friend for alderman, and it also shows that for the purpose of furthering such election he arms himself with a pistol in order to overcome possible, if not expected, opposition, associates with himself several others, and they, acting together, secure the services of a number of men whom they conduct and direct to the vari-

ous polling places for the purpose of depositing their ballots. It shows that these leaders were provided with pistols and were ready to overcome even armed opposition, which in the nature of things, they must have foreseen might be the accompaniment of their work. It shows them at the third district polling place two or three times before they finally made the attempt to work in their fraudulent and illegal ballots, and they saw there was a crowd of citizens there with whom it might be dangerous to come in conflict for the purpose of accomplishing their object. With this knowledge the defendant and his companions nevertheless come to the third district polls for the last time and there make the attempt to have their repeaters vote. In the course and by reason of carrying out this "repeating plan," which could only have been adopted to further accomplishment of the main design to secure by any means the election of Dunlop, an affray commences which the defendant had necessarily foreseen was probable and which he would seem to have been prepared for. The jury might judge his actions from that moment as those of a man who had deliberated upon if not planned the disturbance which arose, and such actions the jury might say were not those of a man suddenly confronted with excitement and danger, but of one who having foreseen the commencement of the affray was prepared to act during its continuance with calmness and deliberation.

Evidence which thus plainly tends to show that the affray must naturally have been regarded as probable and calculated upon by the defendant, tends also to show directly the deliberate character of the act of defendant in firing the shot which killed the deceased; it tended to show against the defendant that the disturbance itself was not an ordinary election affray growing out of a sudden and unpremeditated dispute between men whose feelings had become wrought up to a high state of nervous excitement which was quickly followed by a resort to personal violence and which culminated in the use of a deadly weapon in a moment of uncontrollable passion. On the contrary, the evidence in question tends to render clear, to strengthen and to free from doubt the question as to the state

of the defendant's mind in regard to coolness and deliberation at the very time when he aimed the shot which killed the deceased; it tends to show that the act was deliberate and that in its perpetration the defendant was guilty of murder in the first degree. What took place at the caucus in February preceding the election was drawn from the defendant within the proper limits of a cross-examination and was competent as an examination of any witness for the purpose of bearing upon credibility and his interest. No crime was proven there, and none asserted as against Shea, the defendant. It showed the great interest he took in the success of his friend Dunlop from the commencement of the contest down to the murder of Ross. Upon the ground which has thus been stated and for the purpose mentioned we are clear the evidence objected to as to repeating was admissible, and the defendant's exception thereto is without merit.

Sixth. The defendant's counsel moved for a new trial after his conviction, and among other grounds, specified the failure of the prosecution to indorse on the indictment the names of all the witnesses called and examined before the grand jury. It appears that the names of two witnesses who were called before the grand jury were omitted from the indorsement of names on the indictment, all the other names being there. How the names happened to be omitted was not explained. Section 271 of the Code of Criminal Procedure directs that the names of the witnesses examined before the grand jury must be indorsed upon the indictment before it is presented to the court. If not so indorsed, the court must, upon the application of the defendant at any time before trial, direct the names of such witnesses, as they appear upon the minutes of the grand jury, to be furnished to him forthwith. The defendant's counsel concede that if no names had been indorsed upon the indictment, the course pointed out by the above section would have been their only remedy, but they assert that inasmuch as some names appeared on the indictment, they had the right to suppose that all of them had been indorsed, and when in the course of the trial it appeared that those two names had been omitted, they had the right to pursue this remedy and to de-

mand that a new trial should for that reason be granted. We dissent from that view of the subject, and we fail to see any such distinction. While the counsel for a defendant might if so disposed, assume that the indictment had all the names indorsed upon it, still the fact that it bore some names would not preclude the defendant from seeking information upon that subject and from appealing to the court under that section for the purpose of obtaining information, and if it should then appear that any names had been omitted, the court could direct them to be then furnished.

In addition to that answer in this case, it does not appear that defendant suffered the least prejudice on account of the omission, or that the witnesses were, in truth, of such a character that it prejudiced the defendant to have their evidence received, while he had not had the time or means at his disposal to show their true character or that their particular testimony was false.

Under such circumstances, it would be a most lame conclusion for this court to order a new trial and set aside a verdict which had been reached after so enormous an amount of labor and the expenditure of so large a sum of money as this trial has already cost the people of Rensselaer county. Where it is entirely clear the defendant has suffered no prejudice from this omission to comply with the statute, it is the duty of the court to deny the application, assuming that it might, under some possible circumstances, be ground for the granting thereof, and that this court might review the determination of the trial court.

This completes the review of the questions which were prominently brought to our attention on the argument. We have looked at the other questions raised by the numerous exceptions of the counsel for the defendant upon the trial, and also the other grounds for reversing the convictions which are set forth in the proceedings subsequent to the verdict. We find nothing in them to warrant us in disturbing the judgment of the court below.

The record which we now close contains a melancholy instance of the results of idleness and bad companions upon a young man. This defendant and many of his associates had no steady

employment, and apparently had no desire for it.  They them-selves concocted and entered upon the plan of electing their candidate by fraudulent votes, and they pursued it as if it were fair, decent and honest object.  It does not appear, nor is it important, to know to what political party the defendant osten-sibly belonged.  Such men have no politics.  As the soldier of fortune of a bygone age fought, so these repeaters vote for the candidate who pays them.  They are neither Democrats or Republicans, but are the enemies of law and order at all times and under all circumstances.  The crime is one against self-government, against republican institutions, against freedom itself.

Government by the people cannot long exist if practices such as this record discloses are continued.  We cannot, and we do not, for a moment believe that they are prominent public or party men of either political party who countenance or who would sustain these modes of conducting an election, otherwise we should despair of the republic.  The defendant and his com-panions seem to have been alone in their methods and to have proceeded in a manner evincing the most disregard of every principle of law.  We feel, therefore, that unless our institu-tions are to become a farce, and elections are to represent a combination of force and fraud, such practices as are now spoken of must be stamped out by the most vigorous and active legal measures and by the co-operation of all political parties. The repeater is the modern pirate, an enemy of organized and civilized society, and it is the duty of all men of all parties to assist the officers of the law in the prompt punishment of the guilty.  The importance of this subject cannot be overesti-mated, but this is not the occasion to enlarge upon it.  View-ing this case in all its aspects we feel that there is nothing for this court to do other than to affirm the judgment, and it is affirmed accordingly.

All concur.

Judgment affirmed.