[Crim. No. 4673. In Bank. June 7, 1946.]

THE PEOPLE, Respondent, v. LOUISE PEETE, Appellant.

Frederic H. Vercoe, Public Defender, and William B. Neeley, Deputy Public Defender, for Appellant.

Robert W. Kenny, Attorney General, Frank Richards, Deputy Attorney General, Fred N. Howser, District Attorney, and John Barnes, Deputy District Attorney, for Respondent.

TRAYNOR, J.—An information was filed against defendant by the District Attorney of Los Angeles County, charging her with the murder of Margaret R. Logan. The jury found defendant guilty of murder in the first degree and made no recommendation as to punishment. Defendant admitted a charge of a previous conviction of murder and serving a term therefor. The trial court denied her motion for a new trial. This appeal is automatic from the judgment imposing the death penalty.

Defendant was convicted in 1921 of the murder of Jacob C. Denton. On June 2, 1920, approximately two weeks after defendant had leased his residence, Denton disappeared. Defendant answered inquiries as to his whereabouts with various statements: that he had been shot in the arm by an unknown "Spanish woman"; that he was avoiding his residence because he was ashamed of his wound; that his arm had been amputated; that he had gone to one or another part of the country; that he wanted to conceal his affairs from his family and acquaintances. She also stated that he had given her a bill of sale to his automobile; that he permitted her to open his mail; that he authorized her to sell his house and accept the first payment. Defendant rented the Denton residence to a third party, forged Jacob Denton's name to a lease, had dealings for the sale of the residence, drew forged checks against Denton's bank account, attempted to gain entrance to his safety deposit box, went through his papers, pawned his diamond rings, explaining that she gave the proceeds to the "Spanish woman," gave away some of his clothing and had some made over for her daughter, and attempted to discourage search for him. On September 23, 1920, Denton's body was found buried under his residence. A bullet had entered the back of the neck at the fourth cervical vertebra and severed the spinal cord, causing instant death. The decomposed state

of the body indicated that he was killed about the time of his disappearance. Although defendant did not testify, she made a lengthy explanation to a deputy district attorney of her conduct after Denton's disappearance, which was discredited.

Following her conviction, defendant spent eighteen years in the state penitentiary. During and following her imprisonment, she told a number of persons that she expected to acquire a valuable estate or "trust fund" in the near future. The evidence shows that these statements were false, and that defendant was impecunious. The evidence also indicates that after her release in 1939 she procured a revolver by theft.

In November, 1943, she was engaged by Mrs. Logan, whom she had known many years, for domestic service and care of Arthur Logan, who was then 73 years of age and in a state of senile dementia. Arthur Logan was committed to an institution for the insane early in November, 1943, on petition filed by his wife. Defendant aided Mrs. Logan in securing this commitment. Mrs. Logan regretted her action and he was paroled later that month to her care. Mrs. Logan gave defendant two letters in November, 1943, for use in connection with her husband's release, which stated that defendant was her "foster sister." Defendant retained these letters until they were found on her person at the time of her arrest thirteen months later.

On March 19, 1944, Mrs. Logan placed her husband in a private sanitarium for one week. The records of the sanitarium reveal that Mr. Logan was unruly and noisy on occasions, but was not dangerously violent. Testimony was given that Mrs. Logan's purpose in placing him in the sanitarium was to have him cared for while she worked at an aircraft factory.

Before Mrs. Logan's death on May 29, 1944, defendant purported to finance through a trust fund a $50,000 real estate purchase by herself and Mrs. Logan, the property to be held in joint tenancy. She failed to obtain the $2,000 escrow deposit, and the decedent procured the sum by pledging her savings account. After Mrs. Logan's death, the escrow period expired with the purchase price remaining unpaid, and defendant obtained one-half of the deposit by forging the decedent's name to an instrument giving defendant the power of attorney for decedent. Earlier, on May 19, 1944, defendant

forged a check for $200 drawn on Mrs. Logan's checking account, and deposited the check in an account held jointly with her husband. A cashier, however, discovered the forgery and notified Mrs. Logan, who directed him to charge the sum to her account and reassured him that the forger would repay the obligation. Defendant was unable to do so, however, until two days after Mrs. Logan's death, when she made partial payment with funds appropriated from a refund of money paid for railroad tickets by decedent.

On May 2, 1944, defendant secretly married and moved to a nearby hotel. She did not reveal her criminal record to her husband. She told several people during that month that Mr. Logan was having dangerous fits of violence. She stated to one witness that ''One morning you are going to wake up and read the headlines in the paper of a terrible tragedy,'' but repeatedly asked the witness not to mention her statement to Mrs. Logan. Defendant was at the Logan home on May 29, 1944, the date of the decedent's disappearance and death. Two days later, she and her husband moved into the Logan home. On or about June 1, 1944, on the pretext that Mrs. Logan had been seriously injured in an automobile accident, defendant induced Arthur Logan to accompany her to a probation officer. On the basis of defendant's statements that she was Mrs. Logan's ''foster sister,'' and that in an insane rage, Arthur Logan had attacked his wife, bitten her on the neck and nose, and had bitten defendant on the hand, he was sent to the psychopathic ward of a county hospital, and later to the Patton State Hospital. Defendant did not mention to the probation officer that Mrs. Logan had been shot. Defendant forged Mrs. Logan's name to subsequent correspondence with the Patton authorities. Arthur Logan became increasingly ill and died on December 6, 1944. At defendant's direction, his body was given to a medical school for scientific purposes.

In response to inquiries as to Mrs. Logan's whereabouts, defendant reiterated her statement as to an attack by Arthur Logan, adding that Mrs. Logan had gone to an institution for plastic surgery, and that because she was self-conscious about the disfigurement caused by the attack, she did not want any of her friends to see her. Defendant stated on various occasions that Mrs. Logan had gone to Santa Monica, San Bernardino, Oregon, ''inland,'' Denver, ''back east,'' and New York; that defendant was purchasing the Logan home; that Mrs. Logan

no longer desired the personalty in the home and had told her to do what she wanted with it; that Mrs. Logan did not want her car and that defendant had but one more paper to sign and it would be hers; and that Mrs. Logan intended never to return to her home.

Defendant lived with her husband in the Logan residence from May 31, 1944, to December 20, 1944, the date of her arrest. During this period, she had some of Mrs. Logan's clothing made over to fit herself, opened Mrs. Logan's mail, and when necessary answered it in Mrs. Logan's name, had the interior of the house repainted and various articles of furniture remodeled, paid incidental bills, gave away and loaned fine articles of personalty, promised her relatives Mrs. Logan's diamonds, sold an electric mangle, and used the Logan car, gas coupons, and food stamps.

Shortly after Arthur Logan's death defendant obtained forms necessary to make a death claim for $1,425 owing on his life insurance policy, and sent them to the Patton authorities with a letter of instruction on which she forged Mrs. Logan's name. After her arrest, two deeds of gift that purported to give the Logan property to her were found in a suitcase under her bed. Defendant testified that the deeds had been drafted in good faith by her husband because he felt insecure since they were occupying the property neither as owners nor as tenants.

It was Mrs. Logan's duty to file monthly parole reports on defendant's conduct. Defendant wrote all parole reports from June to December, 1944, and forged Margaret Logan's name thereto. Suspicion arose as to their authenticity, and she was taken into custody on December 20, 1944. At the time of her arrest, defendant was going through Mrs. Logan's papers. She gave the arresting officers the same explanation of the decedent's absence that she had previously given others. After a brief search the body of Mrs. Logan was found in a shallow grave in the back yard of the Logan residence. Defendant had placed a high, solid gate between the garage and the corner of the house that prevented passage or view from the driveway to the back yard. The autopsy revealed that a bullet had entered the back of the neck and struck the fourth cervical vertebra, narrowly missing the spinal cord, and had passed out of the body below the left jaw. Death was caused by two depressed fractures of the skull.

Defendant testified that Mrs. Logan was killed by Arthur Logan in an insane rage on May 29, 1944. She admitted that the explanation that she had given for Mrs. Logan's disappearance was false, but explained that her conduct after May 29, 1944, was designed to conceal the death to obviate suspicion that would be cast on her because of her criminal record. A witness testified that Arthur Logan had bruised his wife on a previous occasion, and that Mrs. Logan stated that he was ''hard to handle.'' Defendant testified that at about 2 o'clock in the afternoon of May 29, 1944, she ran into the Logan living room in answer to an urgent call from Mrs. Logan, and found Mr. Logan struggling with and biting his wife; that the latter was bleeding profusely from wounds under her eyes, at the end of her nose, and in her neck; that she later found a piece of flesh that looked like a part of Mrs. Logan's nose. Examination of Mrs. Logan's body revealed minor abrasions but no evidence of biting or other injury to the face or neck. Testimony was given that Arthur Logan had no natural teeth, and was very feeble and in poor health, as contrasted to Mrs. Logan, who was ten years his junior and a strong, heavy woman. Defendant further stated that Arthur Logan was enraged because he thought he was about to be sent to an institution for the insane; that after separating the Logans, defendant refrained from calling the police at Mrs. Logan's request; that Arthur Logan procured a steak hammer from the kitchen and struck his wife on the face and head with it; that she and Mrs. Logan sank to the floor, she holding the victim's head; that later she sent Mr. Logan to the back porch, locking him out, on the pretext of his watching for Mr. Butler, who was to call for the ironing mangle; that later she heard voices and went to the door, spoke to Mr. Butler and gave him the mangle. Mr. Butler's testimony that he telephoned defendant concerning the mangle several days before he called for it and that defendant then informed him that Mrs. Logan had been in an accident, indicated that when he later called for the mangle Mrs. Logan had already been dead several days. He testified further that he walked to the front door of the residence and rang the bell; that a voice from the front bedroom told him that he would find the mangle outside the back porch and that nothing else was said; that he saw no one in the back yard and no one came to the back door.

Defendant testified further that during this period she did

"both the normal and the abnormal thing"; that she readmitted Mr. Logan; that he again "flicked" Mrs. Logan's head with the steak hammer; that later Mr. Logan came out of a bedroom brandishing the defendant's revolver, and struck Mrs. Logan with it; that defendant then raised Mrs. Logan from the floor; that the revolver fell to the floor, Mr. Logan again struck his wife with the steak hammer, and she again fell to the floor; that defendant, whose clothing was bloody, now feared calling the police or neighbors, although Arthur Logan was also covered with blood, and was still acting in an insane manner; that because blood was coming out of Mrs. Logan's mouth, defendant turned her so that she lay face down; that Mr. Logan again struck his wife; that defendant then heard several shots; that defendant was "paralyzed" at this time in a "semi-kneeling" position.

Defendant's testimony that she heard several shots was contrary to evidence that after careful search only one bullet was found, imbedded in the wall 38½ inches from the floor. Although defendant testified that the decedent was shot by her husband from a standing position, no bullet hole or ricochet mark was found in the rug or floor where, according to her testimony, the shooting occurred. Expert testimony was given that because carbon particles were found two inches within the bullet wound, the gun must have been placed against the decedent's neck when fired. Although defendant testified that Mr. Logan struck his wife several times with the steak pounder, no marks on the skull of deceased that might have been made by the conical knobs on the instrument were found. Blood and human hair were found, however, on the revolver, and the butt of the weapon, which contained a defect, fitted perfectly into the two depressed fractures of the skull that were the cause of death.

Defendant testified that after the decedent was shot, she telephoned a doctor to learn how to quiet Mr. Logan, and following his advice, gave Mr. Logan four sleeping tablets. The doctor testified that although he did not recall the conversation, he would not in any case have ordered such a dose. Defendant stated that Mrs. Logan, who because of defendant's fear for her own safety had received no medical attention, died at 8 o'clock in the evening, and that having determined to conceal her death, defendant washed the blood off Arthur Logan, cleaned the blood from the rug and floor, and buried

the body in the back yard. Concerning the probability that Mr. Logan would have absolved her had he killed his wife in an insane rage, defendant stated that Mr. Logan did not remember what occurred during his attacks of violence. Other witnesses testified that although forgetful, he remembered past social affairs and important current events.

The prosecution's theory was that the jury could infer from the foregoing evidence that before the Denton murder defendant conceived a scheme whereby she could gain wealth by finding a suitable victim and acquiring his property by murder; that although the execution of the scheme was thwarted in the Denton case, her false statements while in prison concerning her prospective wealth were designed to forestall suspicion that might arise should she succeed after parole in a new attempt that she contemplated; that similar statements, and also statements that Arthur Logan was becoming increasingly violent, made to neighbors and friends of the Logans before the date of the present tragedy, were designed to lay the groundwork for an attempt to acquire the Logan property by murdering Mrs. Logan and procuring the recommitment of Arthur Logan; that defendant's inability to procure funds for the escrow deposit in the real estate transaction or to repay the amount of the forged check in all probability indicated to Mrs. Logan that defendant's financing of the real estate purchase was fictitious; that the power in Mrs. Logan's hands to report that defendant had, by committing the forgery, violated her parole, and to recommend that she be sent back to the penitentiary was an additional motive for murder; that on May 29, 1944, defendant in all probability gave Arthur Logan the sleeping tablets before the murder, and after he had thus been disposed of, shot the unsuspecting Mrs. Logan from behind at close range in an attempt to sever the spinal cord; but that realizing from the victim's actions that she had missed her mark, defendant fractured her skull by two blows with the butt of the revolver.

Defendant concedes the sufficiency of the evidence to sustain the verdict. She contends, however, that there is a general rule against the admissibility of evidence concerning prior crimes, and that evidence concerning the Denton murder does not fit into any "exception." ▋ It is settled in this state, however, that except when it shows merely criminal disposition (*People* v. *Cook,* 148 Cal. 334, 340 [83 P. 43]; *People* v. *Glass,* 158 Cal. 650, 658 [112 P. 281]), evidence

that is relevant is not excluded because it reveals the commission of an offense other than that charged. "The general tests of the admissibility of evidence in a criminal case are: . . . does it tend logically, naturally, and by reasonable inference, to establish any fact material for the people, or to overcome any material matter sought to be proved by the defense? If it does, then it is admissible, whether it embraces the commission of another crime or does not, whether the other crime be similar in kind or not, whether it be part of a single design or not." (*People* v. *Sanders*, 114 Cal. 216, 230 [46 P. 153]; *People* v. *Morani*, 196 Cal. 154, 157 [236 P. 135]; *People* v. *Nakis*, 184 Cal. 105, 114 [193 P. 92]; *People* v. *Cook*, 148 Cal. 334, 340-342 [83 P. 43]; *People* v. *Suesser*, 142 Cal. 354, 363 [75 P. 1093]; *People* v. *Wilson*, 117 Cal. 688, 691 [49 P. 1054]; *People* v. *Craig*, 111 Cal. 460, 468 [44 P. 186]; *People* v. *Tucker*, 104 Cal. 440, 442 [83 P. 195]; *People* v. *Lane*, 101 Cal. 513, 517 [36 P. 16]; *People* v. *Rogers* 71 Cal. 565, 567 [12 P. 679]; *People* v. *McGilver*, 67 Cal. 55, 56 [7 P. 49]; *People* v. *Cunningham*, 66 Cal. 668, 671 [4 P. 1144, 6 P. 700, 846]; *People* v. *Fitzgerald*, 14 Cal.App.2d 180, 202 [58 P.2d 718]; *People* v. *Foster*, 79 Cal.App. 328, 333 [249 P. 231]; *People* v. *Revley*, 67 Cal.App. 553, 562 [227 P. 957]; *People* v. *Klopfer*, 61 Cal.App. 291, 294 [214 P. 878]; *People* v. *Kiser*, 22 Cal.App. 10, 15 [133 P. 516, 134 P. 346]; *People* v. *Tomalty*, 14 Cal.App. 224, 233-234 [111 P. 513]; *People* v. *Rowland*, 12 Cal.App. 6, 19 [106 P. 428]; *People* v. *McPherson*, 6 Cal.App. 266, 270 [91 P. 1098]; see cases cited, 8 Cal.Jur. 60, 13 Cal.Jur. 703; Fricke, California Criminal Evidence, 215; 13 So.Cal.L.Rev. 511, 513; 28 Cal.L.Rev. 516; Stone, *The Rule of Exclusion of Similar Fact Evidence: England*, 46 Harv.L.Rev. 954; Stone, *The Rule of Exclusion of Similar Fact Evidence: America*, 51 Harv.L.Rev. 988.) "It is true that in trying a person charged with one offense it is ordinarily inadmissible to offer proof of another and distinct offense, but this is only because the proof of a distinct offense has ordinarily no tendency to establish the offense charged. But whenever the case is such that proof of one crime tends to prove any fact material in the trial of another, such proof is admissible, and the fact that it may tend to prejudice the defendant in the minds of the jurors is no ground for its exclusion." *People* v. *Walters*, 98 Cal. 138, 141 [32 P. 864]; *People* v. *Ellis*, 188 Cal. 682, 689 [206 P. 753];

*People* v. *Ebanks,* 117 Cal. 652, 663 [49 P. 1049, 40 L.R.A. 269].)

The relevance of evidence that proves crimes other than that charged, however, must be examined with care. (*People* v. *Albertson,* 23 Cal.2d 550, 577 [145 P.2d 7]; see Stone, *supra,* 46 Harv.L.Rev. 954, 983.) In the present case, the question of the admissibility of evidence concerning the Denton murder was submitted to the trial court before trial, and the court's decision to admit the evidence was made after extended argument on the part of counsel. Defendant made no request that the jury be admonished at the time of the admission of the evidence as to its relevance. The court's instructions,* while not models to be followed, did not under the circumstances prejudice the defendant.

---

*''Evidence has been received in this case concerning the matter of the alleged death of Jacob C. Denton in the year 1920, and some of the facts surrounding that transaction including the matter of the prosecution of this defendant in connection therewith have been introduced in evidence. This evidence was not received and should not be considered by you as tending to indicate that the defendant is the kind of a person who, because of the commission of another crime, would be more likely to have committed the crime with which she is now charged, and for which she is now being tried. You must not consider such evidence for that purpose. If you find from the evidence relating to the said Denton transaction that the defendant was guilty of a felonious homicide in connection therewith, you must not permit this fact to prejudice you against the defendant. This evidence has been received and is to be considered by you only for one or all of the following purposes and for no other purpose whatsoever. You may consider the evidence relating to the Denton transaction for these purposes only:

''First, for the purpose of determining the motive if any which actuated the defendant in the commission of the crime of which she is now charged.

''Second, for the purpose of determining whether the death of Margaret R. Logan was the result on the one side of accident or the sudden outburst of Mr. Logan, or on the other hand whether the death of Margaret R. Logan was the result of design upon the part of this defendant.

''Third, for the purpose of determining the identity of the murderer, if you find that a murder was committed; that is to say, if a murder were committed did the defendant herself plan and commit the murder, or was the slaying accomplished by Mr. Logan, the defendant being innocent in the transaction.

''Fourth, for the purpose of determining whether the murder of Margaret R. Logan, if you find the fact to be that she was murdered by the defendant, was the result of and a part of a general plan or scheme on the part of the defendant of which the death of Jacob C. Denton and Margaret R. Logan were both parts.

''Fifth, for the purpose of showing knowledge as a part of criminal intent, and absence of good faith, in connection with acts of this defendant prior to, during, and after the death of Margaret R. Logan.

''If you find that the death of Jacob C. Denton in 1920 was accom-

■ Since defendant's conviction was based on the theory that Margaret Logan's death was part of a scheme to acquire property by murder, proof of such a scheme was essential to the prosecution's case. Evidence concerning another offense is relevant to prove that a death resulted from the execution of a scheme when in the light of the circumstances of the crime sought to be proved, it indicates the existence of such a scheme. When a defendant's conduct in connection with the previous crime bears such similarity in significant respects to his conduct in connection with the crime charged as naturally to be explained as caused by a general plan, the similarity is not merely coincidental, but indicates that the conduct was directed by design. (See 2 Wigmore, Evidence (3d ed.) 202, 275; *R.* v. *Smith,* 41 Crim.App.Rep. 229, 236.) In *People* v. *Lisenba,* 14 Cal.2d 403, 427 [94 P.2d 569], this court held that evidence that a former wife of defendant, whose life he had insured, had drowned under circumstances tending to incriminate the defendant, was admissible to prove that defendant, in the execution of a scheme of insuring and murdering wives, had murdered a second wife, whom he had also insured, and who also drowned under circumstances pointing towards defendant's guilt. *People* v. *Gosden,* 6 Cal.2d 14, 24 [56 P.2d 211], held that evidence that a former wife of defendant had died of strychnine poisoning after defendant had insured her life, was admissible to prove that defendant murdered a second wife, whom he had also insured, and who also died of strychnine poisoning. In *People* v. *King,* 4 Cal.App.2d 727, 731 [41 P.2d 593], it was held that evidence that on two prior occasions the two defendants had burglarized or attempted to burglarize apartments of apartment managers by a scheme whereby one would burglarize the manager's apartment while the manager was engrossed in conversation with the other, was admissible to prove that the burglary charged was committed in the execution of such a scheme. (See, also, cases cited, *People* v. *King, supra,* 4 Cal.App.2d 727, 731 [41

---

plished by the defendant for the purpose of enabling her to acquire the property of said Denton, you have a right to consider the circumstances prior to, during and after that transaction in connection with the matters of motive, plan or scheme, knowledge, accident or design, and identity of the perpertrator of the crime charged in the present information. If, however, you should find that the defendant did not murder Jacob C. Denton, then the evidence connected with that transaction should be disregarded by you, and you should reach your verdict upon the other evidence in this case alone.''

P.2d 593] ; 23 Cal.L.Rev. 530; 2 Wigmore, *supra*, 275; Fricke, *supra*, 224.)

The striking similarity in significant respects between defendant's conduct in the Denton case and her conduct in connection with Mrs. Logan's death strongly indicates a scheme by defendant to acquire the property of a suitable victim by murder. In each case, defendant obtained access to the victim's home before the murder and responded to inquiries as to the decedent's whereabouts by stating that the decedent had been injured by a third party, that defendant had since been in touch with decedent, that the decedent had gone to one or another part of the country, and had not returned because of self-consciousness caused by the injury. Instead of transferring the decedent's assets to the heirs, in each case defendant, after the decedent's death, treated the decedent's residence and personal property as her own: She used the decedent's automobile and made claims of ownership thereto; had the decedent's clothing made over for herself or her daughter; gave away or sold personal property of the decedent that she did not want; went through papers belonging to the decedent; attempted by forgery to acquire decedent's personal property; opened the decedent's mail; stated that she was going to buy or sell the decedent's residence and prepared or had prepared instruments purporting to lease or deed the residence to her. After the death of Jacob Denton, she stated that he wanted to conceal his affairs from his friends and relatives. After Mrs. Logan's death, she stated that Mrs. Logan intended never to return to her home and no longer wanted the personalty therein. In each case, defendant stated that the decedent was shot while she was on the premises, but she did not get in touch with the police. In each case, the condition of the decedent's body, buried under or near his residence, indicated that the method of killing sought by the assailant was by a bullet from behind severing the spinal cord at the neck. In each case, defendant gave a detailed explanation of her unusual conduct following the disappearance and death of the decedent but was discredited.

The expiration of a number of years between the Denton murder and Mrs. Logan's death is not significant, since defendant was in the penitentiary until 1939, and was under the supervision of parole authorities after that year. There

was therefore little opportunity for her to find a suitable victim before entering into the employ of the Logans.

■ Since the defendant testified that Mrs. Logan was killed by her husband, the court properly instructed the jury that evidence concerning the Denton case tended to prove that defendant had a motive for killing Mrs. Logan. (*People v. Gosden, supra,* 6 Cal.2d 14, 24; *People v. Argentos,* 156 Cal. 720, 726 [106 P. 65]; *People v. Miller,* 121 Cal. 343, 346 [53 P. 816]), and served to rebut her defense. (See *People v. Lane,* 101 Cal. 513, 517 [36 P. 16]; 13 So.Cal.L.Rev. 511, 512.)

■ The instruction that the Denton transaction tended to identify defendant as the murderer was likewise proper, since the method by which Jacob Denton was murdered, a bullet from behind severing the spinal cord at the neck, produced instant death with a minimum of resistance, and tended to identify defendant as the one who similarly attempted to sever Mrs. Logan's spinal cord. (See 2 Wigmore, *supra,* 387.)

■ The final purpose for which the jury was allowed to consider evidence concerning the Denton case, to show knowledge and absence of good faith on defendant's part, was also proper. Since defendant explained that her unusual conduct following Margaret Logan's death was designed to obviate suspicion that might be engendered by her criminal record, evidence that her similar conduct after the murder of Jacob Denton aided in her conviction for that murder, tended to prove that she knew the incriminating effect of such conduct, and that therefore her explanation was false and in bad faith. (See *People v. Whalen,* 154 Cal. 472, 476 [98 P. 194], and cases cited; *People v. Gosden, supra,* 6 Cal.2d 14, 24.)

■ Defendant contends that the court erred in admitting evidence of the Denton murder on the ground that section 1025 of the Penal Code provides that when a defendant who pleads not guilty has been charged with a previous conviction and admits the charge, ''the charge of the previous conviction must not be read to the jury, nor alluded to on the trial.'' A previous conviction is charged, however, solely for the information of the court and the prison authorities in determining the punishment to be imposed in case of conviction. (*People v. Thomas,* 110 Cal. 41, 43 [42 P. 456]; see Pen. Code, §§ 644, 666, 667, 668, 3025.) This section, as well as section 1093 of

the Penal Code, prevents the circumvention, by reading or alluding to the admitted charge in the presence of the jury, of the rules against the admission of evidence of a previous conviction when such evidence is not relevant or admissible to impeach. (See *People* v. *Sansome,* 84 Cal. 449, 451 [24 P. 143].) It was not designed to exclude relevant evidence nor to prevent the impeachment of a witness by proof of conviction of a felony. (*People* v. *Oliver,* 7 Cal.App. 601, 604 [95 P. 172] ; *People* v. *Mullaly,* 77 Cal.App. 60, 64 [245 P. 811] ; see *People* v. *Oppenheimer,* 156 Cal. 733, 738 [106 P. 74] ; *People* v. *Jeffries,* 47 Cal.App.2d 801, 805 [118 P.2d 190].)

The judgment roll in the Denton case, consisting of the indictment, plea, verdict, proceedings on arraignment for judgment, and judgment, were introduced over defendant's objection. The prosecution contends that this record was admissible as part of the proof that defendant committed a crime relevant to present issues, in that it renders defendant's guilt thereof res judicata. (See *People* v. *Majado,* 22 Cal. App.2d 323, 326 [70 P.2d 1015] ; 147 A.L.R. 991, 996.) Since, however, the prosecution made no objection to defendant's testifying that she did not kill Jacob Denton and that she did not know whether he was dead, and requested no instruction that his death at defendant's hands was established as a matter of law, defendant's guilt of Denton's murder was not treated below as res judicata. The record of the judgment was admissible in any event to impeach defendant's testimony (Code Civ. Proc., § 2051; *People* v. *Booth,* 72 Cal.App. 160, 166 [236 P. 987]), and the court emphasized in its instructions that this evidence was to be considered for this purpose.

Although when no judgment has been pronounced, a conviction may be proved by the record of the verdict (*People* v. *Ward,* 134 Cal. 301, 307 [66 P. 372]), when a judgment has been rendered, the record thereof establishes the previous conviction beyond dispute, and the record of the earlier proceedings is cumulative. (See Code Civ. Proc., §§ 1838, 2044; *People* v. *Peak,* 66 Cal.App.2d 894, 913 [153 P.2d 464].) Defendant was not prejudiced by the introduction of the record of proceedings preceding the judgment in the Denton case, however, for these proceedings added little information to that related in the judgment.

Defendant contends that it was error to admit over

objection evidence that the Denton case was affirmed on appeal and to permit the prosecution to elicit this information from her on cross-examination. Affirmation on appeal is relevant, however, to a determination of the weight to be given a previous conviction. (See *People* v. *Hardwick,* 204 Cal. 582, 589 [269 P. 427, 59 A.L.R. 1480].) Such a conviction may be shown by examination of the witness to impeach him. (Code Civ. Proc., § 2051.)

 Defendant, while being cross-examined as to her previous conviction, stated of her own volition that she was prevented by force from testifying in the Denton case. It is contended that error was committed in overruling an objection to cross-examination concerning this statement. Although the prosecution may not, in impeaching a witness by proving a previous conviction inquire as to the merits of the conviction (*People* v. *David,* 12 Cal.2d 639, 646 [86 P.2d 811] ; *People* v. *Eldridge,* 147 Cal. 782, 786 [82 P. 442] ; *People* v. *Chin Hane,* 108 Cal. 597, 606 [41 P. 697] ), defendant's testimony tended to mitigate the discrediting effect of the Denton conviction, and could not have been prejudicial.

 Defendant contends that the court erred in excluding a verified petition by Margaret Logan executed in connection with her husband's commitment in November of 1943. The petition recited that Arthur Logan "has threatened to burn down the house, and has also threatened to kill me and himself. He struck me a week ago with his fist and my face is still bruised from the assault. He cannot be controlled or managed and needs supervision and care." The petition was hearsay and inadmissible to prove that these recitals were true. (*People* v. *Willard,* 150 Cal. 543, 548 [89 P. 124] ; *People* v. *Lee,* 108 Cal.App. 609, 612 [291 P. 887] ; *Adkins* v. *Brett,* 184 Cal. 252, 256 [193 P. 251] ; see 5 Wigmore, *supra,* 76.) Defendant contends that it was nevertheless admissible to support her defense that Arthur Logan was the assailant in that it indicated that Mrs. Logan feared her husband and believed him dangerous. The petition was offered, however, before defendant testified that Mr. Logan was the assailant, and was excluded on the ground that Mrs. Logan's state of mind toward her husband was not in issue. Although the right to offer it later without the necessity of an authenticating witness was reserved, the petition was not again offered.

Even if it be assumed that the petition was admissible to

prove Mrs. Logan's state of mind, it is improbable that had it been admitted the jury would have inferred that Mrs. Logan feared a murderous attack by her husband. The jury was informed of the nature of the petition by recitals in a final judgment admitted in evidence declaring Arthur Logan insane and ordering his commitment. The judgment recited that Margaret Logan on November 8, 1943, testified "in regard to the mental condition of said person . . ." and that on the basis of this testimony and that of two medical examiners, Arthur Logan was found "dangerously mentally ill," and that unless he was given supervision, he "may endanger health, person and property. . . ." Defendant admitted, moreover, that Mrs. Logan's reason for procuring her husband's commitment was the hope that he would be cured. Testimony of other witnesses revealed that Mr. Logan had been weakened by a major operation, and was very feeble. Defendant, who was present when the petition was prepared by a Los Angeles County deputy clerk from statements by Mrs. Logan, testified that because Mrs. Logan did not know the procedure, she aided her in procuring the commitment; that Mrs. Logan told defendant that the bruise on Mrs. Logan's face, referred to in the petition, was in fact caused by her husband's tripping her; that Mrs. Logan regretted filing the petition, wept, and stated that she would never again place her husband in an institution.

The judgment and the order denying the motion for a new trial are affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Schauer, J., and Spence, J., concurred.

CARTER, J.—I dissent. In my opinion it was error to admit in evidence the matters pertaining to commission of the crime of 1920. In view of the volume of this evidence and the circumstantial nature of the proof as a whole, it cannot be said that the defendant was not prejudiced.

It is the settled policy of the law of this state to give effect to the universally recognized general rule of exclusion under which a defendant may be tried for no offense other than that with which he is charged (8 Cal.Jur. § 167, p. 58; *People* v. *Albertson*, 23 Cal.2d 550, 576 [145 P.2d 7]; see, also, Wharton's Crim. Evidence, §§ 343, 344, pp. 483 et seq.; 20 Am.Jur. § 309, p. 287; 22 C.J.S. § 682, pp. 1084 et seq.) This

rule and the reasons for it are well stated in the leading case of *People* v. *Molineux*, 168 N.Y. 264, 291 [61 N.E. 286, 293; 62 L.R.A. 193] : ''The general rule of evidence applicable to criminal trials is that the state cannot prove against a defendant any crime not alleged in the indictment, either as a foundation for a separate punishment, or as aiding the proofs that he is guilty of the crime charged. (1 Bishop's New Crim. Pro. sec. 1120.) This rule, so universally recognized and so firmly established in all English-speaking lands, is rooted in that jealous regard for the liberty of the individual which has distinguished our jurisprudence from all others, at least from the birth of Magna Charta. It is the product of that same humane and enlightened public spirit which, speaking through our common law, has decreed that every person charged with the commission of a crime shall be protected by the presumption of innocence until he has been proven guilty beyond a reasonable doubt. This rule, and the reasons upon which it rests, are so familiar to every student of our law that they need be referred to for no other purpose than to point out the exceptions thereto. The rule itself has been stated and discussed in this court in a number of cases, but we will cite only a few. In *People* v. *Sharp* (107 N.Y. 427 [14 N.E. 319, 1 Am.St.Rep. 851]) it was said: 'The general rule is that when a man is put upon trial for one offense he is to be convicted, if at all, by evidence which shows that he is guilty of that offense alone, and that, under ordinary circumstances, proof of his guilt of one or a score of other offenses in his lifetime is wholly excluded.' In *Coleman* v. *People* (55 N.Y. 81) it is laid down as follows: 'The general rule is against receiving evidence of another offense. A person cannot be convicted of one offense upon proof that he committed another, however persuasive in a moral point of view such evidence may be. It would be easier to believe a person guilty of one crime if it was known that he had committed another of a similar character, or, indeed, of any character; but the injustice of such a rule in courts of justice is apparent. It would lead to convictions, upon the particular charge made, by proof of other acts in no way connected with it, and to uniting evidence of several offenses to produce conviction for a single one.'

''In *People* v. *Shea* (147 N.Y. 78 [41 N.E. 505]) the rule is thus stated: 'The impropriety of giving evidence showing

that the accused had been guilty of other crimes merely for the purpose of thereby inferring his guilt of the crime for which he is on trial may be said to have been assumed and consistently maintained by the English courts ever since the common law has itself been in existence. Two antagonistic methods for the judicial investigation of crime and the conduct of criminal trials have existed for many years. One of these methods favors this kind of evidence in order that the tribunal which is engaged in the trial of the accused may have the benefit of the light to be derived from a record of his whole past life, his tendencies, his nature, his associates, his practices, and in fine all the facts which go to make up the life of a human being. This is the method which is pursued in France, and it is claimed that entire justice is more apt to be done where such a course is pursued than where it is omitted. The common law of England, however, has adopted another, and, so far as the party accused is concerned, a much more merciful doctrine. By that law the criminal is to be presumed innocent until his guilt is made to appear beyond a reasonable doubt to a jury of twelve men. In order to prove his guilt it is not permitted to show his former character or to prove his guilt of other crimes, merely for the purpose of raising a presumption that he who would commit them would be more apt to commit the crime in question.' . . . The court of last resort in Pennsylvania thus states the rule: 'It is the general rule that a distinct crime unconnected with that laid in the indictment cannot be given in evidence against a prisoner. It is not proper to raise a presumption of guilt on the ground that having committed one crime, the depravity it exhibits makes it likely he would commit another. Logically, the commission of an independent offense is not proof in itself of the commission of another crime. Yet it cannot be said to be without influence on the mind, for certainly if one be shown to be guilty of another crime equally heinous, it will prompt a more ready belief that he might have committed the one with which he is charged; it, therefore, predisposes the mind of the juror to believe the prisoner guilty.' (*Shaffner* v. *Commonwealth*, 72 Pa.St. 60 [13 Am.Rep. 649].)''

After thus reviewing the general rule, the court in the Molineux case discusses the applicability of various exceptions, saying: ''The exceptions to the rule cannot be stated with categorical precision. Generally speaking, evidence of other crimes is competent to prove the specific crime charged

when it tends to establish (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others; (5) the identity of the person charged with the commission of the crime on trial. (Wharton on Crim. Ev. [9th ed.] sec. 48; Underhill on Ev. sec 58; Abbott's Trial Brief, Crim. Trials, sec. 598.)''

First, as to motive, it is pointed out that ''in every criminal trial when proof of motive is an essential ingredient of the evidence against a defendant, the motive to be established is the one which induced the commission of the crime charged. This is too simple for discussion. To hold otherwise would be to sanction the violation of the general rule under the guise of an exception to it.'' In the present case, the motive which prompted the crime charged, if defendant committed that crime, was to acquire for herself the property of her victim, or to prevent the victim from reporting the forgery of the check or other misconduct. In either case the fact of the 1920 murder was of no probative value in establishing the motive for the later crime. Because of the large percentage of crimes committed for the purpose of feloniously acquiring property of another, that similarity of motive alone is not sufficient to warrant application of the exception to the general rule.

Second, as to intent, which is distinguishable from motive, it is obvious that proof of an intent to kill Denton in 1920 was of no probative value in establishing an intent to kill another at a different time.

Third, under the facts it is clear, and indeed there is no contention to the contrary, that the exception relating to the absence of mistake or accident has no application.

Fourth, as to plan or scheme, it is said in the Molineux case, that ''To bring a case within this exception to the general rule which excludes proof of extraneous crimes, there must be evidence of system between the offense on trial and the one sought to be introduced. They must be connected as parts of a general and composite plan or scheme, or they must be so related to each other as to show a common motive or intent running through both. . . . Some connection between the crimes must be shown to have existed in fact and in the mind of the actor, uniting them for the accomplishment of a common purpose, before such evidence can be received. This

connection must clearly appear from the evidence. Whether any connection exists is a judicial question. If the court does not clearly perceive it, the accused should be given the benefit of the doubt and the evidence rejected. The minds of the jurors must not be poisoned and prejudiced by receiving evidence of this irrelevant and dangerous description.'' Applying this test to the present facts, it is seen that there is no evidence of common purpose, plan, or scheme. At most the prosecution showed that two isolated murders were committed, with twenty-four years intervening between them, for the apparent purpose in each case of securing the victim's property. The death of both victims was not a means to a single goal.

Lastly, as to the exception covering identity, it is said in the Molineux case: ''There are not many reported cases in which this exception seems to have been affirmatively applied. A far larger number of cases, while distinctly recognizing its existence, have held it inapplicable to the particular facts then before the court. The reason for this is obvious. In the nature of things there cannot be many cases where evidence of separate and distinct crimes, with no unity or connection of motive, intent or plan, will serve to legally identify the person who committed one as the same person who is guilty of the other. The very fact that it is much easier to believe in the guilt of an accused person when it is known or suspected that he has previously committed a similar crime proves the dangerous tendency of such evidence to convict, not upon the evidence of the crime charged, but upon the superadded evidence of the previous crime. Hence our courts have been proverbially careful to subject such evidence to the most rigid scrutiny, and have invariably excluded it in cases where its relevancy and competency was not clearly shown. As was said in *People* v. *Sharp* (107 N.Y. 471 [14 N.E. 319, 1 Am.St. Rep. 851]) such evidence 'tends necessarily and directly to load the prisoner down with separate and distinct charges of past crime, which it cannot be supposed he is or will be in proper condition to meet or explain, and which necessarily tend to very gravely prejudice him in the minds of the jury upon the question of his guilt or innocence.' Such evidence gives opportunity for the conviction of an accused person upon mere prejudice instead of by evidence showing the actual commission of the crime for which a defendant is on trial. It compels a defendant to meet an accusation not charged in

the indictment, which he might successfully refute if given the opportunity to do so, unembarrassed by other issues.'' In the present case the defendant was admittedly at the scene of the murder. The only issue was whether it was she or Mr. Logan who struck the blows and fired the fatal shot. How evidence of the 1920 crime could prove her identity rather than that of Mr. Logan as the murderer is obscure, unless it can be said that the two crimes show a common plan or scheme. But, as already stated, no common plan appears other than perhaps a purpose to feloniously acquire property of the victim, and that is not a sufficient connection to justify application of the exception to the general rule.

The development of the law in this state shows a departure from the early restrictions governing the application of exceptions to the general rule as defined in the Molineux case. This is evidenced by decisions such as *People* v. *Lisenba*, 14 Cal.2d 403 [94 P.2d 569], and cases there reviewed (see dissenting opinion reported in volume 89 2d of the Pacific Reporter at pages 54-108). In my opinion the pendulum has swung too far to the side of admissibility. The restrictions should be reappraised and given effect. As said in *People* v. *Albertson*, 23 Cal.2d 550, 577 [145 P.2d 7] : ''The trial court, however, should be guided by the rule that such proof is to be received with 'extreme caution,' and if its connection with the crime charged is not clearly perceived, the doubt is to be resolved in favor of the accused, instead of suffering the minds of the jurors to be prejudiced by an independent fact, carrying with it no proper evidence of the particular guilt.'' (See, also, *People* v. *Glass*, 158 Cal. 650 [112 P. 281] ; *People* v. *Lane*, 100 Cal. 379, 387-390 [34 P. 856] ; *People* v. *Darby*, 64 Cal.App.2d 25 [148 P.2d 28] ; 13 Cal.Jur. § 84, p. 707 ; 8 Cal.Jur. § 168, p. 61.)

An indication of the policy of this state to adhere to a limited application of the exceptions to the general rule is found in section 1025 of the Penal Code, enacted in 1874, which provides that when a defendant who pleads not guilty has been charged with a previous conviction and admits the charge, ''the charge of the previous conviction must not be read to the jury, nor alluded to on the trial.'' Although, as the majority opinion notes, this statute, as construed and applied, does not exclude relevant evidence, or prevent the impeachment of a witness by proof of conviction of a felony, nevertheless this

court just recently took occasion to comment at length on the prejudice which is thrust upon any defendant charged with crime who has been previously convicted of a felony (*People* v. *Adamson,* 27 Cal.2d 478, 494 [165 P.2d 3]). So far as possible the settled policy underlying the enactment should be given effect (see *People* v. *Sansome,* 84 Cal. 449, 451 [24 P. 143] ; *People* v. *Hobbs,* 37 Cal.App.2d 8, 11 [98 P.2d 775]), and the application of exceptions to the general rule should be confined to the narrow field laid down in early cases.

The issue of remoteness is an important one. The proximity of the offense charged to the prior offense sought to be introduced in evidence is universally considered by the courts in determining whether such evidence is admissible (63 A.L.R. 602; 22 C.J.S. §§ 683-689, pp. 1089-1111; 1 Wharton's Criminal Evidence (11th ed.) § 361, p. 569; 8 Cal.Jur. § 170, p. 65). Generally it must appear that the evidence of other offenses relates to acts that occurred shortly before, or shortly after, the commission of the offense for which the accused is being tried. However, no definite time limit can be fixed, and the matter rests largely in the discretion of the court. The California Jurisprudence text writer states: ''In regard to the distance of time between the principal fact and the collateral fact to be shown in proof of knowledge or intent, no precise rule can be established so far as the admissibility of the evidence is concerned. If the principle upon which this evidence is introduced is the doctrine of chances or probabilities, the remoteness of such occurrences in point of time goes to the weight rather than the admissibility of the evidence. In such cases, if the evidence has any application under the rule, whether or not it has sufficient weight to entitle it to be submitted to the jury is a question for the trial court. The question must be left in a great measure to the discretion of the judge who tries the case.'' (8 Cal.Jur. § 170, p. 66.)

Under this rule, it appears that in this case the mere fact of extreme remoteness did not compel the exclusion of evidence of the prior offense by the trial judge. However, when it is considered that twenty-four years elapsed between the two crimes, eighteen of which were spent by the defendant in prison with ample time for reflection, it is at least arguable that even had she originally intended to murder a second victim, she would hardly have planned to carry out the crime by the same method which had resulted so disastrously for her in the first instance. In other words, the fact of remoteness,

considered with all of the other facts in this case, negatives any common plan and supports the conclusion that the trial court abused its discretion in admitting evidence of the prior offense.

In my opinion the defendant should be retried on evidence confined to the commission of the offense with which she is here charged.

For the foregoing reasons I would reverse the judgment.

Appellant's petition for a rehearing was denied July 2, 1946. Carter, J., voted for a rehearing.