[Crim. No. 8134.   Second Dist., Div. One.   Jan. 2, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. HARVEY OLIVER DRUMM, Defendant and Appellant.

Harvey Oliver Drumm, in pro. per., and Daniel N. Busby, under appointment by the District Court of Appeal, for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Gilbert F. Nelson, Deputy Attorney General, for Plaintiff and Respondent.

WOOD, P. J.—Defendant was accused, in two counts, of forgery. He admitted allegations of the information that he had been convicted four times on felony charges (larceny of auto, Missouri; assault with intent to commit robbery, Missouri; issuing check without sufficient funds, California; forgery, California). In a trial by jury he was convicted on both counts. He appeals from the judgment and the order denying his motion for a new trial.

Appellant contends that he was denied due process of law; and that the deputy district attorney was guilty of prejudicial misconduct.

Charles Barnett, the owner of a restaurant in Alhambra, testified: That he had known defendant about four months and had permitted him to "run up" a small bill at his restaurant. On May 31, 1961, defendant, accompanied by a woman and child, ate in his restaurant and offered a check in payment for that bill and also for the bill he owed previously, and asked for the difference in cash. This check, marked Exhibit 1, was for $31, drawn on the First Western Bank, payable to Harvey Drumm, and signed "Ella S.

Barnes." He asked defendant whether the check was good, and told him he would rather wait until he could be paid in cash, but defendant said it was good, and that he worked for "this woman." He (witness) pointed out that the check was not endorsed, and then defendant endorsed it and wrote an address on the back, and gave him a telephone number which he (witness) wrote on the check. Then he gave defendant the cash, except about $18 which defendant owed him. The check cleared through the bank and he did not lose any money on it.

Alfred Lombardi, the operator of a liquor store in Alhambra, testified: That he had known defendant and had cashed several pay checks for him in the three or four months prior to May 1961. Defendant presented a check (Exhibit 2) to him for cashing (check dated May 21, 1961, for $47.31, signed "Ella S. Barnes"). He asked defendant whether the check was good, and noticed that it was not endorsed, and then saw defendant endorse it. The check, which was drawn on the First Western Bank, was dishonored and returned to him. About two days later, the defendant came to see him, told him the trouble was caused when Mrs. Barnes transferred her account to the Bank of America, and also told him to put the check through the Bank of America. At that time defendant gave him another check, which was for $20 and was to be credited against the amount he owed. When the first check was presented to the Bank of America, payment on it was refused.

Ella S. Barnes testified: That she had not signed either of the two checks, dated May 31, and May 21, 1961, referred to herein as Exhibits 1 and 2, respectively, and she had not given the defendant or anyone permission to sign her name to either of those checks or any check. She first met defendant in October 1960, when he rented a room at her home for $12 a week. In November, when he was unemployed, she agreed to provide room and board for him for $20 a week, upon credit until he obtained employment. When he became employed he did not pay her, although he stayed there until January 28, 1961. On the preceding day (January 27) she left her home in order to take a position as caretaker for children, and she returned about six weeks later. During that time, in telephone conversations with him, she asked him when he was going to pay her, and he replied that he would pay within two weeks. On May 22, 1960, he came to her home and made a settlement whereby he gave her his

promissory note for $790, payable in installments of $40 monthly, with interest at 7 per cent a year. That amount included charges for room and board, cash she lent him while he was unemployed, $418 which she paid as the purchase price of an automobile registered in his name, and $85 for repairs to the automobile. When she purchased the automobile, he gave her a payment book showing that he then owed her $512, with interest at 7 per cent, which he would pay in installments of $10 monthly. She gave him a watch which had belonged to her deceased son, and she purchased clothes for him. On various occasions he did repair work on houses she owned, and she paid him for the work. She never had an account at the First Western Bank until June or July 1961. On one occasion she rode in the automobile as far as Escondido when he went to San Diego. Their relationship was that of landlord and tenant. She was 69 years of age.

Mr. Zachmayer, assistant manager of the Alhambra branch of the Bank of America, testified that Exhibit 1 (check for $31) had been paid by the bank and charged against Mrs. Barnes' account; that later when the bank was informed that the check was improperly charged to her account, the bank credited her account with said amount and took the loss itself.

Mr. Andrews, called as a witness by defendant, testified that he is the owner of Rod's Service Station in Alhambra; defendant was employed by him for approximately the first four months of 1961—his employment ended about May 1, 1961.

Defendant testified: About nine days after he was released from prison in September 1960, he rented a room from Mrs. Barnes for $12 a week. He did plumbing and electrical work and painting at various houses in Alhambra. While he lived at Mrs. Barnes' home, from the first week in October 1960 to February 1961, he repaired her houses, and she paid him for the work. She purchased a car for him for $418, and registered it in his name. She rode in the automobile with him as far as Escondido, when he went to San Diego on one occasion. They made about 12 trips together, and on the week-end of March 11 and 12, 1961, they stayed all night together at a motel. She gave the car to him and there was no repayment agreement. She also gave him a watch, some money, and clothing. He was employed at Mr. Andrews' service station from approximately the first of 1961 to the middle of May 1961. In January 1961 defendant signed Mrs. Barnes' name on a check, payable to a drug store, when

she told him to write the check. In January, when he lived at her house, he did some electrical and plumbing work and painting for her, and his charge therefor was about $130 but she did not pay it. He talked to her regarding this in March and on May 22, 1961. On the date last mentioned, he telephoned her and she said that it was important for her to see him and she asked him to come to her house. He went there. In said conversation of May 22, he informed her that he was going to be married, and he demanded payment of the money. She said she would not be back for several days. He replied that by that time he would be married, and he wanted to go to Washington (state). She said, "Why don't you take the check book? I left it in the glove compartment and make out the check." He wrote the two checks, which total the amount mentioned, because it would be difficult to cash one personal check for that amount. He cashed one of the checks at Mr. Barnett's restaurant, and he cashed the other one at Lombardi's liquor store. He wrote another check, in connection with this transaction, payable to Evans Appliances, and he believed the bank would honor it. About June 7 he was married in Washington. Since he thought he had a chance of getting his parole transferred to Washington, he wrote to Mr. Lombardi and told him that in the event the check was not good he would send the money from his first check, but if he wanted to go to the police it was up to him. He (defendant) signed the promissory note (Exhibit 3, for $790) under protest on May 22 when Mrs. Barnes called him to her house. She said that if he was not going to move back with her there was no reason that he should not pay for the gifts she had made to him. When he refused to pay, she said she would tell his parole officer that they had been living together. As a result of that threat, he signed the note, but he thought he did not owe the money.

On cross-examination, he said that on May 22 he asked if he might borrow her sewing machine in order to sew seat covers. She told him to take it and return it when she finished moving. He took the machine and pawned it for $10 on May 31, the day he left town. He telephoned her about June 3 and asked what she was going to do about the checks she authorized him to write. She replied that he could choose between returning to her as a companion or she would sign an "affidavit of forgery." He said he would be forced to explain their relationship in court. He is 50 years of age.

Mrs. O'Brien, called as a witness by the People, testified

that Mrs. Barnes was employed by her and was at her home from January 27, 1961, to March 11, 1961; on said last mentioned date Mrs. Barnes went to the home of Mrs. O'Brien's ill mother and remained there until May 19; on March 11, about 10 a. m., Mrs. O'Brien's father came to her home and took Mrs. Barnes to his home; on March 12 Mrs. O'Brien telephoned to her mother's home and talked to Mrs. Barnes.

Appellant contends that he was denied due process of law in that Mrs. Barnes refused to allow an investigator from the public defender's office to examine the checks allegedly written by appellant. (The public defender represented appellant at the trial.) Mrs. Barnes testified that the district attorney had instructed her not to show her checks to anyone. During the trial, Mrs. Barnes said that she would be willing to let counsel for defendant examine any checks if the deputy district attorney told her to do so. Then the deputy district attorney asked counsel for defendant if he wished to have the checks examined. He replied in the affirmative, and thereupon the deputy district attorney submitted all of Mrs. Barnes' checks to him. At that time the judge declared a recess. When court reconvened, counsel for defendant said that he had had a representative of the bank checking the checks against the statement to see if any checks were missing, but he had not finished. The judge asked if counsel for defendant was ready to proceed. He replied, "Yes, we can proceed while he is doing that." It thus appears that when the matter of examining the checks was referred to at the trial, the deputy district attorney caused the checks to be submitted to counsel for defendant for examination, and that the counsel was willing to proceed while the checks were being examined. At the trial Mrs. Barnes said that a check for $85 was missing—she said that she thought she had made the check payable to "Basso's" (automobile company) as payment of a repair bill, and that she had given the check to defendant. Since she could not find a check which was payable to "Basso's" she thought the check was missing. Later, however, at the trial she noticed a check stub which referred to a check for $85, which was payable to cash, and on which stub the word "Harvey" (indicating defendant) was written. Thereupon, she said that the "$85 check" (Exhibit D), which was payable to cash (instead of Basso's) was the alleged "missing" check. It thus appears there were no missing checks, and that counsel for defendant was given an opportunity to examine all the checks under conditions which he

approved. (That counsel does not represent defendant on appeal.) Defendant was not denied due process of law.

Appellant asserts further that the deputy district attorney was guilty of misconduct in presenting evidence. In his brief, appellant states that his counsel argued on the motion for a new trial that the deputy district attorney sought to impeach the defense witness, Mr. Andrews, by asking if he did not think that defendant (his employee) was a shady character and "did he trust him?" He does not cite references to the trial transcript showing that such questions were asked. The trial transcript does not show those questions. Appellant states that his counsel also argued on the motion for a new trial that the deputy district attorney improperly asked the defendant whether he had been "contracting without a license." The defendant had said on direct examination that he was doing small contracting work. The deputy district attorney asked him if he was licensed as a contractor. He replied in the negative. Then the deputy asked whether he knew it was unlawful to do contracting work without a license. An objection to the question was sustained. Those questions did not constitute prejudical misconduct.

Appellant asserts that the deputy district attorney was guilty of misconduct in questioning him regarding a "jail break" by him in Jackson County, Missouri. The deputy had asked defendant if he had been convicted of a felony. The defendant had answered in the affirmative, and had said the felonies were car theft, assault, insufficient-funds checks, and forgery. The deputy asked: "How about breaking out of jail?" Defendant said that was not a felony in Missouri. The deputy asked about breaking out of jail in Jackson County. Defendant replied to the effect that he did not break out of that jail. The deputy offered to prove that defendant did break out of jail. Later, defendant said that he broke out of jail in LaFayette County, not Jackson County. Although defendant had admitted the alleged prior convictions, the prosecution was entitled to impeach him as a witness by proof of conviction of a felony. (See *People* v. *Peete*, 28 Cal.2d 306, 320 [169 P.2d 924].) The deputy was not guilty of misconduct in asking questions regarding the escape.

Appellant also asserts that the deputy was guilty of misconduct in asking him regarding the sewing machine (which he pawned). He argues that that matter was not connected with the offenses charged. As above stated, defendant had testified that Mrs. Barnes gave him permission to

sign the two checks, and he had testified in some detail as to the relationship between him and her. The deputy asked him whether he took her sewing machine. Then he testified as hereinabove related to the effect that he had borrowed it, and had pawned it for $10 the day he left town. He brought up the matter of their alleged relationship, apparently for the purpose of indicating that it would be reasonable to believe that he acted with her permission. The sewing-machine incident was a transaction that was involved as a part of their relationship. That incident would tend to prove a scheme or plan on the part of defendant to act without her permission and to defraud her. The deputy was not guilty of misconduct as asserted in this contention.

Appellant also contends that the deputy district attorney was guilty of misconduct in his argument to the jury. He argues that the public defender (counsel for defendant at the trial) argued upon the motion for a new trial that the court had failed to rule upon many objections which his counsel made during the closing argument of the deputy district attorney. He does not specify any of those asserted objections. The jury argument is not a part of the record on appeal. This contention is not sustainable.

Appellant also contends that the court erred in rulings as to the admissibility of evidence. In this connection he refers to matters heretofore discussed herein relative to prior convictions, contracting without license, and taking the sewing machine. In view of the conclusions hereinabove stated, it is not necessary to discuss this contention further. The court did not err prejudicially in any of its rulings as to admissibility of evidence.

Another contention of appellant is that the court erred in denying his motion for a new trial. He argues that the judge acted arbitrarily in denying the motion in that counsel for defendant made a good showing on the motion, and immediately thereafter the judge denied the motion. There is no merit to this contention.

The evidence amply supports the conviction.

The trial judge made no findings on the prior convictions.

The judgment and the order denying the motion for a new trial are affirmed.

Fourt, J., and Lillie, J., concurred.

A petition for a rehearing was denied January 29, 1963, and appellant's petition for a hearing by the Supreme Court was denied February 27, 1963.