Filed 5/7/21  P. v. Johnson CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOHN TABER JOHNSON,<br><br>    Defendant and Appellant. | B301526<br><br>(Los Angeles County<br>Super. Ct. No. BA464218) |

APPEAL from a judgment of the Superior Court of the County of Los Angeles, Mark S. Arnold, Judge.  Affirmed.

Gail Harper, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Paul M. Roadarmel, Jr. and Michael Katz, Deputy Attorneys General, for Plaintiff and Respondent.

# I.    INTRODUCTION

A jury found defendant and appellant John Taber Johnson guilty of the first degree murder of victim Scott Sterling.  On appeal, defendant claims:  (1) the trial court abused its discretion by allowing evidence of two prior uncharged offenses under Evidence Code section 1101; (2) there was insufficient evidence to show that he was the killer; (3) his counsel provided ineffective assistance by failing to object to inadmissible lay identification testimony; (4) the court abused its discretion by allowing three witnesses to testify about the victim's good character; and (5) the court violated his constitutional rights by imposing a fine and assessments without an ability-to-pay hearing.  We affirm.

# II.    FACTUAL BACKGROUND

## A.    *The Homicide*

According to his father, the victim was raised in a suburb of Detroit and had studied music in Los Angeles, but had lived on the streets in Los Angeles since 2008.  The victim had a modest fixed monthly income from a trust account left by his mother and administered by his sister.  The victim's father last spoke to him eight days prior to his December 29, 2017, death when he arranged for the victim to stay in a hotel for the holiday.

On December 28, 2017, Sandra Nava was working at Barabas, a clothing store on 14th Street located directly east of Fernando's, a tailor shop, in the Fashion District of Los Angeles. At approximately 6:00 p.m., as she was closing, she saw the victim, with whom she was familiar, waiting near Fernando's so

that he could lay down his "carton" to go to sleep. The victim regularly arrived before 6:00 p.m. and would wait for the stores to close before laying down. Nava did not see anyone else near that location when she left for the evening.

At approximately 7:00 a.m. on December 29, 2017, as he drove to work, a witness saw blood streaming from the body of a man lying on the sidewalk in front of Fernando's and called 911.

B.     *Police Investigation, Video Evidence, and Autopsy*

On the morning of December 29, 2017, police and paramedics arrived at the scene, observed that the victim was lying on the sidewalk with the hood of his hoodie over his head, and determined that he was dead. A coroner's investigator searched the victim's belongings and found the victim's driver's license, a credit card, cash, and an iPod device.

Los Angeles Police Department Detective Kasie Chavez noticed that although there were no cameras directly over the victim's location at Fernando's, there was a camera at Carmen Creations, two stores to the west, and at Barabas, directly east. Detective Chavez viewed video footage from the camera at Carmen Creations[1] and observed a male (the suspect) walking eastbound on 14th Street carrying a bag and a cinder block. The suspect walked past Carmen Creations and continued east, toward where the victim's body was found, where he stepped out of view of the camera, while carrying a cinder block in his hand. Approximately 30 seconds later, the suspect walked westbound,

---

[1]     Detective Chavez viewed a recording of the video footage of the surveillance camera as it played on a monitor.

3

back into the view of the video camera, still carrying the cinder block in his hand.

Detective Chavez determined that a cement cinder block was the likely murder weapon and she therefore began "to canvass" the area for the weapon. She went to a business at 1416 South Main Street, observed a large cement cinder block on the sidewalk, and took custody of it.

A witness who worked at 1416 South Main Street testified that when she closed the business on December 28, 2017, at around 5:00 p.m., the cinder block was not outside her store. But, when she arrived the next morning at 7:00 a.m., she saw the cinder block against the wall outside the store.

Los Angeles Police Department Detective Jonathan Vander Lee examined the cinder block and noticed that it had "pieces of black fuzz-type material on one of [its] corners." The detective also inspected the black hoodie the victim wore the morning of his death and observed that it had a small hole or tear in the back right portion of the hood.[2]

Los Angeles County Department of Medical Examiner, Coroner Deputy Medical Examiner Pedro Ortiz reviewed the record of the autopsy performed on the victim and concluded from the nature and extent of his injuries that he died from the effects of blunt force trauma to the right-rear portion of his skull. The injury to the victim's skull was consistent with a blow delivered by the corner of a heavy object, such as a cinder block.

Detective Vander Lee supervised the collection of video evidence by police surveillance specialists and then reviewed all the video collected. On the videos from Carmen Creations and

---

[2]  The cinder block was not analyzed for fingerprints; and the blood and DNA analyses conducted were negative.

4

Barabas covering the period from the evening of December 28 to the morning of December 29, 2017, he observed, in addition to the suspect carrying the cinder block, other "people passing by at times . . . ." But none of them was carrying anything that could have inflicted the blunt force trauma to the victim's head.

Detective Vander Lee created an exhibit comprised of video surveillance footage from various security cameras, stills from those videos, and maps, presented in chronological order. One video from Carmen Creations showed the suspect walking east in front of Carmen Creations, carrying a bag in his left hand and a cinder block on his right shoulder. The video included images of the suspect's face. As the suspect approached Carmen Creations, he put the bag down in the parking lot just west of the business, grasped the cinder block with both hands, and walked toward the victim's location off camera. The video ended at 3:35:32 a.m. The distance between the western border of Carmen Creations, as depicted in the surveillance videos, and the victim's location was approximately 39 feet. Detective Vander Lee walked the distance and found it took him 20 footsteps to cover.

A second video from Carmen Creations began approximately 38 seconds later at 3:36:10 a.m. It showed the suspect returning into the camera's view and walking westbound (that is, away from the victim) with the cinder block in his left hand. As the suspect reached the bag he left in the parking lot, he shifted the cinder block to his right shoulder and picked up the bag in his left hand.

The next two videos, from two different cameras, showed the suspect as he continued westbound on 14th Street toward Main Street with the cinder block on his right shoulder and the bag in his left hand.

5

The suspect was seen again in a video on Main Street, by 16th Street. He was no longer carrying the cinder block. The location of this footage was consistent with where Detective Chavez recovered the cinder block.

The videos collected by the police depicted the suspect as he walked around the vicinity where the victim was found both before and after 3:35 a.m. They showed the suspect was a bearded man wearing a distinctive four-pocket jacket, with a zip-up hoodie underneath, a beanie with a distinctive tag at the top, stained jeans, and reflective shoes with a Nike logo. The bag that the suspect carried had a clearly visible "C" logo and two straps.

C.    *The Arrest*

In January 2018, Los Angeles Police Department Officer Chad Heistermann viewed, at least seven or eight times, videos that depicted the suspect. He also reviewed stills taken from the videos.

On January 7, 2018, Officer Heistermann and his partner patrolled the area by the crime scene, following a route that covered locations where the suspect had been seen on videos from the morning of the homicide. As the officers proceeded north on Main Street toward 14th Street, Officer Heistermann observed defendant, whom he immediately recognized, based on his facial features and attire, as the suspect depicted in the videos.[3] Defendant was carrying a large, black reusable shopping bag that

---

[3]    Defense counsel did not object to this testimony, which is the basis for defendant's ineffective assistance of counsel argument discussed below.

6

resembled the bag carried by the suspect. The officers stopped defendant and arrested him.

According to Officer Heistermann, a photo of defendant taken during booking accurately depicted defendant's appearance and attire on the day he was arrested.

When Detective Vander Lee was notified of defendant's arrest, he met Officer Heistermann at the police station and observed that defendant was wearing the same clothing as the suspect in the videos from the morning of the homicide, including a brown jacket with the four pockets, a black zip-up hoodie underneath, stained blue jeans, and shoes with the Nike symbols and reflectors on the back of both heels. Although defendant's jeans on the day of his arrest had a tear in the front of the left leg that he did not observe in any of the videos, Detective Vander Lee noticed that defendant had a fresh injury to his left knee that corresponded to the tear. The detective also confirmed that the bag defendant was carrying the day of his arrest had a white "C" emblem with white lettering around it and straps that could be worn over the shoulder. In addition, the bag contained a black beanie with a tag on it.

Detective Vander Lee viewed an exhibit that showed a photo of defendant on the day of his arrest next to a still taken from the Carmen Creations' video that showed the suspect carrying the cinder block. He compared the two images and confirmed that defendant was the man on the video. At the time of trial, defendant had shorter hair and had gained approximately 20 pounds since the time of his arrest.

## III. PROCEDURAL BACKGROUND

In an information, the Los Angeles County District Attorney charged defendant with murder in violation of Penal Code section 187, subdivision (a).[4]  The District Attorney alleged that defendant had suffered a prior strike conviction within the meaning of sections 667, subdivision (d) and 1170.12, subdivision (b).  The District Attorney also alleged that defendant was convicted of a prior serious felony within the meaning of section 667, subdivision (a)(1).

Following trial, the jury found defendant guilty of first degree murder.  At the sentencing hearing, the trial court found true the prior strike conviction and the prior serious felony conviction.  The court sentenced defendant to a term of 25 years to life, doubled to 50 years based on the prior strike conviction, plus an additional consecutive five-years based on the prior serious felony conviction, for an aggregate sentence of 55 years to life.  The court also imposed certain fines and assessments.

## IV. DISCUSSION

A.    *Evidence of Uncharged Crimes*

1.    Background

Before trial, the prosecutor moved to admit evidence of defendant's prior assault and battery of two victims pursuant to Evidence Code section 1101, subdivision (b).  The prosecutor

---

[4]    All statutory references are to the Penal Code, unless otherwise indicated.

8

argued that because the means by which defendant committed those assaults closely resembled the means used to murder the victim, namely, with a large piece of cement, testimony from the two prior victims was admissible to show modus operandi and intent.

During the pretrial hearing on the motion, defendant's counsel argued that the only similarity between the prior assaults and the killing of the victim—that the weapons used were all made of concrete—was insufficient to satisfy the criteria for admission under Evidence Code section 1101, subdivision (b). Following argument, the trial court granted the motion, reasoning as follows: "I believe . . . the prior conduct . . . by . . . defendant is admissible to demonstrate in this case that he ha[d] a common plan to utilize pieces of concrete as a weapon. [¶] Also, I . . . think that the fact he ha[d] used concrete in the past is relevant to prove that he was willful, deliberate, and premeditated in this case; the fact he armed himself with something he's used in the past to commit assaults."

At trial, the two victims of the prior assaults testified about the incident as follows: On March 29, 2016, Jonathan Manfrellotti looked out of his window and saw defendant standing by Manfrellotti's car. Defendant looked up, saw Manfrellotti through the window, and then kicked the car. Manfrellotti grabbed a bat and approached defendant. Manfrellotti then watched as defendant moved toward a group of people nearby and struck victim Kenny Pierce on the head with a

"broken piece of cement" or "cinder block."[5]  Pierce then fell to the ground and suffered a wound to his right eye.

As Manfrellotti and others in the group were helping Pierce up, someone yelled, "'Here he comes.'"  Manfrellotti looked up and saw defendant running toward the group while holding "another piece of cement" in his hand, which was the same size as the piece that defendant had used to strike Pierce.  Defendant pursued Manfrellotti and "launched" his body into a gate as Manfrellotti tried to close it behind him.  The gate hit Manfrellotti on the head and caused him to fall to the ground. Manfrellotti then looked up and saw defendant standing over him with the piece of cement.  Defendant told Manfrellotti, "'I'm gonna kill you.'"  Manfrellotti managed to move away from defendant, who then threw the piece of cement hitting Manfrellotti on the wrist and knocking him to the ground again. Manfrellotti ran back down his driveway to the alley, heard sirens, and saw defendant run away down the alley.  Manfrellotti suffered a swollen wrist and cuts down his arm that caused bleeding.

### 2.  Legal Principles

Evidence Code section 1101, subdivision (a) "'expressly prohibits the use of an uncharged offense if the only theory of relevance is that the accused has a propensity (or disposition) to commit the crime charged and that this propensity is circumstantial proof that the accused behaved accordingly on the

---

[5]     Pierce testified that he was struck on his left shoulder blade.

occasion of the charged offense.' [Citation.] 'Subdivision (b) of [Evidence Code] section 1101 clarifies, however, that this rule does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition.' (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393 . . . (*Ewoldt*).) 'If an uncharged act is relevant to prove some fact other than propensity,' such as the perpetrator's intent or identity, or the existence of a common plan, 'the evidence is admissible, subject to a limiting instruction upon request.' [Citation.]

"'Evidence of uncharged crimes is admissible to prove identity, common plan, and intent "only if the charged and uncharged crimes are sufficiently similar to support a rational inference" on these issues.' [Citation.] The degree of similarity varies depending on the purpose for which the evidence is offered. 'The least degree of similarity . . . is required in order to prove intent.' (*Ewoldt, supra*, 7 Cal.4th at p. 402.) For this purpose, 'the uncharged misconduct must be sufficiently similar to support the inference that the defendant "'probably harbor[ed] the same intent in each instance.'"' (*Ibid.*) A higher degree of similarity is required to prove the existence of a common plan: '[E]vidence of uncharged misconduct must demonstrate "not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations."' (*Ibid.*) Finally, . . . '[t]he greatest degree of similarity is required for evidence of uncharged misconduct to be relevant to prove identity.' (*Ewoldt,* [*supra*, 7 Cal.4th] at p. 403.) To establish identity, the uncharged and charged crimes "'must be so unusual and distinctive as to be like a signature.'" (*Ibid.*)

"Even if evidence of the uncharged conduct is sufficiently similar to the charged crimes to be relevant for a nonpropensity purpose, the trial court must next determine whether the evidence's probative value is 'substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.  (Evid. Code, § 352; [Citation.]  [¶]  As with other evidentiary rulings, the trial court's decision is reviewed for abuse of discretion.  [Citation.]" (*People v. Chhoun* (2021) 11 Cal.5th 1, 25–26, fn. omitted (*Chhoun*).)

    3.    <u>Analysis</u>

"It is settled in this state . . . that except when it shows merely criminal disposition [citations], evidence that is relevant is not excluded because it reveals the commission of an offense other than that charged.  'The general tests of the admissibility of evidence in a criminal case are:  . . . does it tend logically, naturally, and by reasonable inference, to establish any fact material for the people, or to overcome any material matter sought to be proved by the defense?  If it does, then it is admissible, whether it embraces the commission of another crime or does not, whether the other crime be similar in kind or not, whether it be part of a simple design or not.'" (*People v. Peete* (1946) 28 Cal.2d 306, 314–315.)

In this case, there were no eyewitnesses to the murder of the victim.  Instead, the prosecution relied largely on circumstantial evidence to show that defendant deliberately and intentionally killed the victim using a cinder block.  The two uncharged crimes, if sufficiently similar to the charged crime,

12

were therefore relevant to corroborate that circumstantial evidence against defendant by showing that he acted on the morning of the killing pursuant to a common plan or design. (*Chhoun, supra*, 11 Cal.5th at p. 26.)

Each of defendant's prior crimes involved violent, unprovoked attacks on unarmed victims. Moreover, during each incident, defendant produced a large piece of cement and, without warning, assaulted the victim with it. In the case of Pierce, defendant swung the concrete-like object toward his head, missing but hitting him in the shoulder and knocking him to the ground; in Manfrellotti's case, defendant first knocked him to the ground and then stood over him with the object in his hand, threatening to kill him, before throwing the object at him and injuring his wrist. Although those prior unprovoked attacks did not result in the death or serious injury of either victim, the circumstances of the assaults could have caused much greater injury or even death. The uncharged offenses therefore were relevant to an issue—defendant's conduct consistent with a common plan or design—other than merely his propensity to commit violent crimes. (See *People v. Daniels* (1991) 52 Cal.3d 815, 857 ["As long as there is a direct relationship between the prior offense and an element of the charged offense, introduction of that evidence is proper"].) Having concluded that defendant's prior assaults were relevant to show common plan or design, we need not decide whether the trial court correctly reasoned that such evidence also was relevant to intent or identity. (*People v. Chism* (2014) 58 Cal.4th 1266, 1307, fn. 13.)

We also conclude that the trial court did not abuse its discretion by admitting the evidence under Evidence Code section 352. The evidence of the uncharged crimes showed that they did

not result in serious injury to the victims, who were both able to testify at trial. By contrast, the victim in the charged crime suffered a significant skull fracture and died from his injury. Thus, "it was unlikely . . . that the jury's passions were inflamed by the evidence of defendant's uncharged offenses." (*Ewoldt, supra*, 7 Cal.4th at p. 405.)

B. *Sufficiency of Identity Evidenc*e

Defendant maintains that there was insufficient evidence to support the jury's finding that he was the murderer. According to defendant, because the prosecution's case was based solely on circumstantial evidence that was not corroborated by any eyewitness testimony describing the actual killing or other forensic evidence, such as DNA, blood, or fingerprints, the video evidence alone did not support a reasonable inference that he was the killer.

1. Legal Principles

"When a defendant challenges the sufficiency of the evidence for a jury finding, we review the entire record in the light most favorable to the judgment of the trial court. We evaluate whether substantial evidence, defined as reasonable and credible evidence of solid value, has been disclosed, permitting the trier of fact to find guilt beyond a reasonable doubt. (*People v. Rivera* (2019) 7 Cal.5th 306, 323–324 . . . .) "'The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence.'" (*Id*. at p. 324.) [¶] We review the sufficiency of the evidence . . . , presuming "'every fact

14

in support of the judgment the trier of fact could have reasonably deduced from the evidence.'" (*People v. Rivera, supra*, 7 Cal.5th at p. 331.) If the finder of fact's determination is supported, whether the prosecutor relied upon direct or circumstantial evidence, we have held that reversal is not warranted, even where "'the circumstances might also reasonably be reconciled with a contrary finding.'" (*Ibid.*)" (*People v. Vargas* (2020) 9 Cal.5th 793, 820.)

    2.    <u>Analysis</u>

As explained in detail above, the video and corroborating evidence showing that defendant was the person who killed the victim was more than sufficient to support the conviction. First, the video evidence showed that from the evening of December 28, 2017, to the morning of December 29, 2017, only one person walked between the cameras located to the east and west of Fernando's, where the victim was found, carrying something that could inflict the blunt force trauma to the victim's head. The footage showed that at 3:35 a.m., that person walked toward the victim carrying a distinctive bag in his left hand and a cinderblock on his right shoulder. The suspect then put down his bag and used both hands to hold the cinder block as he walked toward where the victim was found. Thirty-eight seconds later, the same suspect reappeared in the video, while still carrying the cinder block. The police then recovered a cinder block from a location that corresponded with footage showing the movements of the suspect after the murder. That cinder block was consistent with the weapon that had caused the wound to the victim's head and contained black fuzz on a corner that corresponded with a

black hoodie that the victim was wearing over his head after the murder.

In addition, the uncharged crimes evidence showed that, only a few years prior, defendant engaged in two very similar violent and unprovoked assaults on unarmed victims using a large piece of cement and causing injury to both of them. This additional evidence corroborated the other circumstantial evidence and bolstered the inference that, on the morning in question, the suspect in the video was acting in a manner similar to defendant's actions during the prior assaults.

Considered in its entirety, the evidence against defendant amply supported a finding that the suspect depicted on the video from Carmen Creations was the person who had used a concrete cinder block to fracture the victim's skull while he slept and kill him.

The evidence also sufficiently established that defendant was the suspect depicted in the Carmen Creations videos. Defendant's facial features were consistent with the video from Carmen Creations. Moreover, at the time of his arrest, defendant was wearing the same distinctive four-pocket jacket over a zip-up hoodie, soiled jeans, and Nike shoes with the same heel reflectors that the suspect in the video wore. He also carried a beanie with a distinctive tag that looked like the one shown on the video. Finally, he was carrying a distinctive bag with a "C" logo and straps that looked like the one the suspect was carrying on the night of the murder. Substantial evidence therefore supported the jury's finding that defendant was the person who committed the murder.

16

C.    *Ineffective Assistance of Counsel*

Defendant also contends that Officer Heistermann's testimony that defendant was the suspect depicted in the videos was inadmissible because (1) he was not familiar with defendant's appearance before the time of his arrest; and (2) it was unnecessary to assist the jury in determining whether the suspect in the videos was defendant.  According to defendant, his counsel therefore rendered ineffective assistance by failing to object to the testimony and to request a jury instruction, such as CALCRIM No. 333, on opinion testimony from lay witnesses.

To establish ineffective assistance of counsel, "the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms.  Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. . . .  On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.  All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding.  [Citations.]" (*People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*).)

"A lay witness may offer opinion testimony if it is rationally based on the witness's perception and helpful to a clear understanding of the witness's testimony.  (Evid. Code, § 800.) '[T]he identity of a person is a proper subject of nonexpert opinion

17

. . . .' (*People v. Perry* (1976) 60 Cal.App.3d 608, 612 . . . ; accord, *People v. Mixon* [(1982)] 129 Cal.App.3d [118,] 127 . . . .)  [¶] Court of Appeal decisions have long upheld admission of testimony identifying defendants in surveillance footage or photographs." (*People v. Leon* (2015) 61 Cal.4th 569, 601 (*Leon*).)

We disagree with defendant's contention that Officer Heistermann's testimony that he immediately recognized defendant as the suspect was inadmissible.  The fact that Officer Heistermann did not have contact with defendant before defendant's arrest did not, on its own, render his identification inadmissible. (*Leon, supra*, 61 Cal.4th at p. 601.)  We also disagree with defendant's assertion that the officer's identification was unnecessary because the jury could make its own determination of whether the suspect in the video was defendant.  Although the jurors viewed the video evidence themselves, Detective Vander Lee testified that, at the time of trial, defendant's hair was shorter and he had gained 20 pounds, which suggested that defendant's appearance had changed since the time of his arrest.  Thus, Officer Heistermann's testimony, which was based on his relevant personal knowledge of defendant's appearance shortly after the murder, could have aided the jury in making its determination of whether the suspect shown in the video evidence was defendant.  Counsel therefore did not act unreasonably in failing to object to the testimony.

We also conclude that defense counsel was not ineffective in failing to request a jury instruction such as CALCRIM No. 333, which advised the jury that it could disregard all or any part of any opinion it found unbelievable, unreasonable, or unsupported by the evidence.  Counsel may have reasonably concluded that

18

the instruction was unnecessary in light of the trial court's delivery of other instructions on the evaluation of witness testimony, such as CALCRIM No. 226, which advised, among other things, that, "In evaluating a witness's testimony, you may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony." That instruction then proceeded to list numerous factors that the jurors could consider in evaluating witness testimony, including the witness's ability to perceive the matters about which he or she testified, the witness's demeanor, and the reasonableness of the testimony in light of all the other evidence.

D.    *Evidence of Victim's Character*

Defendant contends that the trial court abused its discretion when it allowed three witnesses to testify about the victim's good character, including testimony that: the victim came from a good family that provided him access to a trust fund; the victim was nice and kind; and the victim was polite, respectful, and humble. According to defendant, that testimony was irrelevant to the sole issue in the case—the killer's identity—and was otherwise highly prejudicial.

1.    <u>Background</u>

Outside the presence of the jury, defense counsel objected to the introduction of a photo of the victim taken when he was younger and not living on the streets, arguing that the photo was more prejudicial than probative under Evidence Code section 352. When the trial court indicated its agreement with defense

19

counsel, the prosecutor explained that she intended to introduce two photos of the victim during his father's testimony, the younger photo and one taken more recently while the victim was living on the streets. According to the prosecutor, the victim's father remembered him as he looked in the younger photo and, although he recognized his son in the more recent photo, that was not how he remembered him.

In response, defense counsel objected to "the whole line of testimony," explaining that, to the extent the photos and the father's testimony were relevant to identification, they were more prejudicial than probative on that issue. The prosecutor responded that the father's testimony was necessary to show how and why the victim was found with cash, a credit card, and an iPod device and also to show that "it wasn't a robbery." The trial court agreed that the father's testimony was admissible to show that the victim was lawfully in possession of the cash, credit card, and iPod, but ruled that the younger photo of the victim was not admissible. At trial, the victim's father testified about the victim's background, as described above.

Nava, in response to a question about how long she had known the victim, testified that she had known him for three years, and then volunteered that he was a "[n]ice person. He used to come and wait for us to close the stores so that he could put his carton [down and] go to sleep. He never, never talked to nobody. But he was very polite. We offered him food or anything and he said no." The trial court sustained defendant's objection that the answer was nonresponsive. Defendant did not move to strike the testimony. Later in her testimony, Nava was asked to describe the victim. She responded that "[h]e was very nice. [A v]ery kind person." Defendant did not object to the question or

move to strike the answer; and when the prosecutor clarified that she was asking for a physical description of the victim, Nava described only his appearance.

The prosecutor asked Officer Heistermann to describe the victim based on his multiple interactions with him on the streets. He responded that he first had contact with the victim when the officer arrested him on a warrant and then saw the victim on subsequent occasions "just in passing." The officer described the victim as "Incredibly polite. Respectful." Defendant objected on relevance grounds, but the trial court overruled the objection. When the prosecutor advised the officer that he could continue with his answer, he stated, "Polite. Respectful. Quiet. Humble." Later in his testimony, the officer was asked if he inquired about the victim's well-being when they spoke on the street, and the officer replied, "I would try. He was very quiet and humble and didn't like too much attention, but I always made a point to ask though."

### 2. Standard of Review

A trial court's rulings on the admission of evidence over relevance and Evidence Code section 352 objections are reviewed for abuse of discretion. (*People v. Scott* (2011) 52 Cal.4th 452, 490 ["The trial court has broad latitude in determining the relevance of evidence. [Citations.] We review such determinations for abuse of discretion"]; *Chhoun, supra*, 11 Cal.5th at p. 26 [rulings under Evidence Code section 352 are reviewed for abuse of discretion].)

Pursuant to Evidence Code section 353, a judgment will not be reversed based on the erroneous admission of evidence unless

21

an objection or motion to strike the evidence is "timely made and so stated as to make clear the specific ground of the objection or motion," and the reviewing court concludes "the error or errors complained of resulted in a miscarriage of justice."  "In accordance with this statute, [our Supreme Court has] consistently held that the defendant's failure to make a timely and specific objection on the ground asserted on appeal makes that ground not cognizable. [Citations.] [¶] . . . [¶]  The objection requirement is necessary in criminal cases because a contrary rule would deprive the People of the opportunity to cure the defect at trial and would permit the defendant to gamble on an acquittal at his trial secure in the knowledge that a conviction would be reversed on appeal. [Citation.]  The reason for the requirement is manifest:  a specifically grounded objection to a defined body of evidence serves to prevent error.  It allows the trial judge to consider excluding the evidence or limiting its admission to avoid possible prejudice.  It also allows the proponent of the evidence to lay additional foundation, modify the offer of proof, or take other steps designed to minimize the prospect of reversal." (*People v. Partida* (2005) 37 Cal.4th 428, 433–434 (*Partida*), internal quotation marks omitted.)

3.      Analysis

We conclude that defendant fairly preserved his objection to Officer Heistermann's testimony that the victim was polite and respectful by objecting on relevance grounds.  We will also assume that defendant's objection to the father's testimony during the hearing on the admissibility of a photograph of the victim was sufficient to preserve his argument on appeal.  We

22

thus consider whether the trial court prejudicially erred in admitting their testimony.

During his brief testimony, the father explained that the victim had lived on the streets of Los Angeles since 2008, but that he had a modest monthly income from a trust account administered by his sister. That testimony was elicited to show that, despite his apparent homeless circumstance, as later described by Nava, the victim had the ability to pay for the personal belongings that were found in his backpack. That fact, in turn, had a tendency in reason to rebut any inference that defendant was the victim of a robbery and therefore supported inferentially the other evidence that defendant intended to kill the victim. Thus, the trial court did not abuse its discretion in admitting the father's testimony.

We will assume without deciding that the trial court erred in admitting Officer Heistermann's testimony, but nonetheless find any such error harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).) Officer Heistermann's testimony about the victim was brief. And, contrary to defendant's contention, evidence that the victim was polite and respectful to a police officer did not necessarily suggest that he was a "nice guy." Nor was the testimony unduly prejudicial. The trial court instructed the jury, "Do not let bias, sympathy, prejudice, or public opinion influence your decision. Bias includes, but is not limited to, bias for or against the . . . alleged victim . . . ." "We presume the jury followed the court's instruction." (*People v. Martinez* (2010) 47 Cal.4th 911, 957.) On this record, it is not reasonably probable that a result more favorable to defendant would have been reached had the court excluded the testimony. (*Watson, supra*, 46 Cal.2d at p. 836.)

23

As to Nava's testimony, the only objection defendant made during the portions of the testimony about which he now complains was to her testimony that defendant was a nice person and very polite. But he objected only that such testimony was "nonresponsive" and the trial court sustained the objection. Defendant did not make a timely motion to strike the testimony. He therefore has forfeited his challenges to Nava's testimony on appeal. (*Partida, supra*, 37 Cal.4th at p. 435; see also *People v. Abel* (2012) 53 Cal.4th 891, 924.)

E.      *Restitution Fine and Court Operations Assessment*

Finally, defendant contends that the trial court violated his due process and equal protection rights and the prohibition against excessive fines by imposing a $300 restitution fine, a $40 court operations assessment, and a $30 criminal conviction assessment without first determining defendant's ability to pay. He also argues that, if he forfeited his claim by failing to object in the trial court, then he received ineffective assistance of counsel.

In *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), the court held, "[D]ue process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay before it imposes court facilities and court operations assessments under . . . section 1465.8 and Government Code section 70373." (*Id.* at p. 1164.) It further held that the execution of a restitution fine under section 1202.4 "must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine." (*Ibid.*)

24

By failing to object to the imposition of fines and fees at sentencing, defendant has forfeited his claim on appeal. (*In re Sheena K.* (2007) 40 Cal.4th 875, 880; see, e.g., *People v. Aguilar* (2015) 60 Cal.4th 862, 864.) Moreover, we find no ineffective assistance of counsel. The record is silent as to trial counsel's reasons, if any, for failing to object to the trial court's imposition of the assessments and fine without a hearing to determine defendant's ability to pay. There is at least one satisfactory explanation for counsel's failure to request an ability to pay hearing: Counsel may have concluded that based on his lengthy term in custody, defendant was able to pay his assessments and fine. (*People v. Castellano* (2019) 33 Cal.App.5th 485, 490 [relevant factors regarding ability to pay "may include, but are not limited to, potential prison pay during the period of incarceration to be served by the defendant"], fn. omitted; *People v. Jones* (2019) 36 Cal.App.5th 1028, 1035 ["[w]ages in California prisons currently range from $12 to $56 a month"].) Under these circumstances, defendant cannot prevail on his appellate claim of ineffective assistance of counsel. (*Mai, supra*, 57 Cal.4th at p. 1009.)

## V.   DISPOSITION

The judgment of conviction is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


KIM, J.


We concur:


RUBIN, P. J.


BAKER, J.